IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

HOUA LAO,

          Petitioner,               2:  08 - cv - 3171 - MCE TJB

    vs.

TIM VIRGA,

         Respondent.         ORDER, FINDINGS AND

                                   RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was found guilty by a jury of first degree murder, premeditated attempted murder, discharging a firearm from a vehicle as well as specific findings that he caused great bodily injury, discharged a firearm and committed the offense to benefit a criminal street gang.  Petitioner was sentenced to life without the possibility of parole plus twenty five years to life plus twenty years.  Petitioner filed a federal habeas petition in December 2008 and an amended habeas petition on April 1, 2009.  Petitioner raises the following claims in his amended federal habeas petition:  (1) insufficiency of the evidence to convict him of murder and attempted murder ("Claim I"); (2) ineffective assistance of counsel ("Claim II"); (3) ineffective

1

assistance of co-defendant's counsel during his closing argument ("Claim III"); (4) trial court error in failing to declare a mistrial due to a witness's communications with the jury ("Claim IV"); and (5) jury instructional errors ("Claim V").  For the following reasons, the amended federal habeas petition should be denied.

## II.  FACTUAL BACKGROUND[1]

This case arises from a drive-by shooting involving rival Hmong gangs.  Defendants Her and Lao were members or affiliates of the gang "Masters of Destruction" or "Menace of Destruction," better known by the acronym MOD.

On February 3, 2002, Her and Lao attended a Super Bowl party at Xang Thao's home in Meadowview.  After the game, they departed with several MOD members in a minivan driven by Her's cousin, Rindy Her (Rindy).

Fifteen miles away, on the north side of town, a Toyota Camry was stolen.  At 8:33 p.m. that same evening the stolen Camry drove past an apartment building at 3212 Western Avenue in Sacramento (3212 Western) and fired weapons at Fong Vue, Vue Heu and Yee Xiong, who were standing in front of the driveway.  Heu and Xiong were both affiliated with MOD's chief rival, the Hmong Nation Society or HNS.  MOD claims its territory in South Sacramento neighborhoods such as Meadowview, Valley Hi and Oak Park.  HNS claims the northern part of the city for its territory, including Western Avenue, where the shooting occurred.  Fong Vue died a few days later as a result of shotgun wounds to the head.  Xiong suffered head injuries, but survived the attack.  Xiong tentatively identified Lao as one of the shooters inside the Camry.  Police found shotgun pellets around Fong Vue's body.  Bullets and fragments from one or more handguns were also found around the driveway.  Spent .45-caliber casings were found on the grass between 3212 Western and the adjacent building.

There was evidence that the targeted victims who were standing in front of 3212 Western had returned the gunfire:  Although he denied shooting a firearm himself, residue tests on victim Xiong's hands indicated he had recently fired a gun.  The rear window of the Camry was shattered by a bullet that the People's forensic expert determined was likely fired from outside the vehicle and which exited through the front windshield.  There were also bullet marks in the rear bumper and spare tire.

---

[1]  The factual background is taken from the California Court of Appeal, Third Appellate District opinion on direct appeal filed November 30, 2007 and filed in this court on November 23, 2010 by Respondent as Lodged Document 4 (hereinafter "Slip Op.").

Within minutes of the shooting, Police Officer Warren Estrada spotted the Camry making an illegal turn, near Fifth and G Streets in West Sacramento. When he pulled the Camry over, it initially came to a stop, then led Estrada on a high-speed chase through the adjacent neighborhood. At Second and E, three Asian males jumped out of the car and took off running in different directions. Estrada, now on foot, followed one of the fleeing suspects, who came to an embankment, leaped into the river, and began swimming. Estrada jumped in after him, and eventually pulled Lao, who had tired in the current, out of the water. In his wallet, Lao was carrying a piece of paper with the word "MOD" written on it.

Inside the Camry, police found 12-gauge shotgun casings as well as .32-caliber casings. On the floorboard in the back seat was a blue bandana with a fluid stain that was matched to Her's DNA. A blue jacket, later identified as one worn by Her, was found in the back seat of the car. Inside the jacket was a cell phone. The phone rang from a caller identified on the screen as "Xang." [FN 2] Sergeant James Duncan answered, "Where are you at?" The caller responded that they were at the end of the bridge in Old Sacramento, that there were "hella cops around," and that he should meet them on the other side of the bridge.

> [FN 2] The telephone number displayed on the phone found in the blue jacket matched that of a cell phone belonging to Xang Thao, one of the Super Bowl party attendees.

Using this information, officers went to Old Sacramento and detained defendant Her's cousin Rindy, John Her, Xang Thao and others, who were standing around Rindy's minivan with Xang's cell phone.

Rindy testified that he and his companions were playing pool after the Super Bowl, when they received a call from Her telling Rindy to pick him up at the Money Store. During the call, Rindy heard Lao's voice in the background, saying, "Hurry up." The group tried to get to the Money store, but West Sacramento was inundated with police, so they drove across the bridge into Old Sacramento, where they were arrested.

At 3:00 a.m. the next morning a street sweeper working in West Sacramento recovered a .380-millimeter Beretta semiautomatic pistol and a .32-caliber Colt semiautomatic pistol lying on the side of the road north of E Street. Officers searching the area where the police chase occurred found a 12-gauge shotgun with a pistol grip near F and Second Streets in West Sacramento.

Police later found three unexpended shotgun shells in Lao's closet that were of the same brand as the shells found in the Camry.

Lao's fingerprint was lifted from a passenger door of the Camry. Her's girlfriend, Brenda Ly, testified that Her represented himself to be a member of MOD.  Somewhere between 9:00 and 10:00 o'clock on the evening of the shooting, Ly received a call from Her, telling her to pick him up at a pay phone booth in West Sacramento.  Ly complied.  On the way back to her house, Ly noticed that many police cars and helicopters were in the area and asked Her if he knew anything about it.  He answered, "No," but then added, "I didn't want to tell you because I [would] rather have you not know."

Ly and Her slept together that night.  Between 10:48 p.m. on February 3 and 2:53 the next morning, about 60 phone calls were made from Ly's cell phone, including some to Minnesota.  Ly admitted that she only made "a few" of these calls.

Shortly before 11:00 p.m. on February 3, a series of calls was made to the cell phone of Xang Thao, who was then in police custody.  Officer Corey Johnson answered the phone, and a male voice with an Asian accent at the other end repeatedly asked for Xang.  Johnson kept telling the caller that Xang was busy.  The caller became enraged, referred to himself as "Sac High MOD," and threatened to "kick" Johnson's "f'ing ass" if he did not let him speak to Xang.  While most of the calls came from blocked numbers, the last one, at 10:45 p.m., was from a caller identified on the screen as "Brenda" and in fact came from Ly's cell phone. The day after the shooting, Her traveled to Minnesota.  Her, who was 15 years old, told his girlfriend he was on a "business trip." While he was in Minnesota, he asked Ly to get him the address for Lao, who was by then incarcerated.  In April 2002, Ly sent $220 to Her addressed to "John" Her in Minnesota.  In July 2002, Her was arrested in Minnesota and transported back to California.

Detective Aaron Lee testified as an expert on Asian gangs.  MOD is the largest Hmong gang in Sacramento.  MOD members commit car thefts, homicides, drive-by shootings, robberies and other violent crimes.  There is a history of animosity between MOD and its northern rival, HNS.  Younger brothers, cousins or relatives of MOD gang members tend to join smaller groups.  One of these groups is the Youth Mafia Society, or YMS.  After explaining the various factors that go into validating a youth as a gang member, Lee testified that defendant Her has been a validated member of YMS since the year 2000.  Defendant Lao is a validated member of MOD, as letters he wrote from jail bear out his affiliation.

Detective Lee described several incidents exemplifying the enduring rivalry and hostility between the MOD's and HNS gang. He told the jury that a gang member who participates in a drive-by shooting enhances his reputation within the gang and sends a message to the community to fear and respect the gang.  Gang members do not normally tread into the territory of their rivals.

4

Presented with a hypothetical drawn from the evidence in this case, Lee opined that a drive-by shooting committed in well-known HNS territory by three MOD members was committed for the benefit of the MOD street gang.

(Slip Op. at p. 2-7.)

### III.  PROCEDURAL HISTORY

After Petitioner was convicted and sentenced, he appealed to the California Court of Appeal.  In that appeal, Petitioner raised four claims which raised various arguments related to the jury instructions.  Petitioner's conviction and sentence was affirmed by the California Court of Appeal on November 30, 2007.  In January 2008, Petitioner filed a petition for review with the California Supreme Court.  Petitioner raised three of his alleged jury instruction error claims in that petition for review.  On March 12, 2008, the California Supreme Court summarily denied the petition for review.

In December 2008, Petitioner filed a federal habeas petition.  Petitioner raised the following claims in that initial federal habeas petition:  (1) ineffective assistance of counsel; and (2) prosecutorial misconduct.  On March 6, 2009, Magistrate Judge Brennan dismissed the initial federal habeas petition with leave to amend because Petitioner had named as respondents the People of California and the Attorney General of the State of California, neither one of which had custody over the Petitioner.  Petitioner amended his federal habeas petition in late March 2009.  The amended federal habeas petition raised the four claims outlined in supra Part I, namely:  (1) insufficiency of the evidence to convict Petitioner of murder and attempted murder, (2) ineffective assistance of counsel; (3) ineffective assistance of co-defendant's counsel during his closing argument; and (4) trial court error in failing to declare a mistrial due to a witness's communications with the jury.

In September 2009, Respondent moved to dismiss the amended federal habeas petition arguing that Petitioner failed to exhaust all of his claims in his amended petition.  Petitioner opposed the motion to dismiss and also filed a motion to stay the amended petition.  On August

1  12, 2010, Magistrate Judge Brennan recommended denying the motion to dismiss and denying

2  the motion to stay as moot.  Judge Brennan explained that Petitioner's amended federal habeas

3  petition was really a "mixed" petition in that Petitioner cited to three additional claims he

4  exhausted as listed in Appendix 1 of his amended petition.  Appendix 1 is a copy of Petitioner's

5  petition for review to the California Supreme Court on direct appeal.  Magistrate Judge Brennan

6  also noted that Petitioner attached a copy of a state habeas petition that he filed in the California

7  Supreme Court on October 28, 2009 which raised the first four claims he raised in his amended

8  federal habeas petition.  The California Supreme Court ultimately summarily denied that state

9  habeas petition on April 14, 2010 citing In re Swain, 34 Cal. 2d 300, 304 (1949) and People v.

10 Duvall, 9 Cal. 4th 464 474 (1995).  Judge Brennan determined that Petitioner's motion to stay

11 was moot and that Respondent's motion to dismiss must be denied since it "rests on the ground

12 that petitioner never raised these four claims before the California Supreme Court."  (Dkt. No. 27

13 at p. 4.)  District Judge England approved Magistrate Judge Brennan's August 12, 2010 findings

14 and recommendations on September 27, 2010 and Respondent was ordered to file an answer.

15      Respondent filed an answer on November 16, 2010.  Petitioner filed a traverse on

16 February 3, 2011.  On August 23, 2011, the matter was reassigned to the undersigned.

17          IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

18      An application for writ of habeas corpus by a person in custody under judgment of a state

19 court can only be granted for violations of the Constitution or laws of the United States.  See 28

20 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

21 Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

22 Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

23 and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

24 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

25 decided on the merits in the state court proceedings unless the state court's adjudication of the

26 claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States; or (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in state court.  See 28 U.S.C. 2254(d).  When no state court has reached the

merits of a claim, *de novo* review applies.  See Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir.

2005).

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

application clause, a federal habeas court making the unreasonable application inquiry should ask

whether the state court's application of clearly established federal law was "objectively

unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

not issue the writ simply because the court concludes in its independent judgment that the

relevant state court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

determining whether a state court decision is an objectively unreasonable application of clearly

established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

applied, we may look for guidance to circuit precedents.").

The first step in applying AEDPA's standards is to "identify the state court decision that

is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

//

7

V.  ANALYSIS OF PETITIONER'S CLAIMS

A.  Claim I

In Claim I, Petitioner argues that there was insufficient evidence at trial to convict him of murder and attempted murder.  In support of this argument, Petitioner argues that even assuming he was in the Toyota, the evidence at trial demonstrated that he acted in self-defense because the people at Western Avenue fired first.  (See Pet'r's Am. Pet. at p. 4-5.)  Respondent argues that this Claim is unexhausted.  However, he also argues that even if this Claim is unexhausted, it can still be denied on the merits.

Before proceeding with a federal habeas corpus petition, a state prisoner must first exhaust state court remedies.  See 28 U.S.C. § 2254(b).  Exhaustion requires that the federal claim be fairly presented to the state's highest court to which appeal is available.  See Cooper v. Neven, 641 F.3d 322, 326 (9th Cir. 2011) (citing O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Picard v. Connor, 404 U.S. 270, 275 (1971)).  Here, Claim I was denied by the California Supreme Court without comment but with citation to Duvall, 9 Cal. 4th 464, 474 and Swain, 34 Cal. 2d 300, 304.  This indicates that the California Supreme Court denied the state habeas petition because it was not alleged with sufficient particularity, making it procedurally deficient.  See Kim v. Villalobos, 799 F.2d 1317, 1319 (9th Cir. 1986).

Claims that are denied as procedurally deficient are unexhausted.  See Kim, 799 F.2d at 1319-20; Harris v. Superior Court of Cal., Los Angeles County, 500 F.2d 1124 (9th Cir. 1974).  However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  As the Ninth Circuit has explained, a federal court considering a habeas corpus petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).  For the following reasons, Claim I can be denied on the merits because it is not "colorable."

The Due Process Clause of the Fourteenth Amendment "protects the accused against

8

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  A petitioner for writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

A federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at 324 n. 16.  Murder is defined by California Law as "the unlawful killing of a human being . . . with malice aforethought," see Cal. Penal Code § 187(a).  Murder in the first degree is defined as follows:

> All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed to primarily penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any action punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree.

Cal. Penal Code § 189.  "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." People v. Superior Court, 41 Cal. 4th 1, 7, 58 Cal. Rptr. 3d 421, 157 P.3d 1017 (2007).

Petitioner asserts in his federal habeas petition that there was insufficient evidence to convict him of murder and attempted murder because the defense demonstrated that the people at

9

1   Western Avenue shot first.  He argues he was acting in self-defense to those shots.  (See Pet'r's

2   Am. Pet. at p. 4.)

3        Viewing the evidence in the light most favorable to the prosecution, Petitioner fails to

4   show that he is entitled to federal habeas relief on his insufficiency of the evidence argument.  As

5   the California Court of Appeal noted:

6           Lao was undoubtedly one of the shooters, based on his
            identification by the surviving victim, his aquatic capture after
7           fleeing from the Camry, the shotgun shells found in his closet, and
            his fingerprint found on the door of the Camry.

8

9   (Slip Op. at p. 9.)

10       While Petitioner makes an effort to reassert that his self-defense theory warrants a finding

11   of insufficiency of the evidence, he fails to note that the jury was specifically instructed that

12   "[t]he right of self-defense is not available to a person who seeks a quarrel with the intent to

13   create a real or apparent necessity of exercising self-defense."  (See Clerk's Tr. at p. 238.)  In

14   light of the rival nature of the gangs, Petitioner's self-defense argument was weakened.  The gang

15   expert testified at trial that HNS's territory included Western Avenue.  (See Reporter's Tr. at p.

16   947-48.)  He specifically stated that the area of Western Avenue where the crime occurred was

17   heavily populated by HNS, or the rival gang to Petitioner's MOD gang affiliation.  (See id. at p.

18   958.)  Furthermore, he testified that you do not go into the rival gang's territory and that if you

19   do, "something like this may happen."  (Id. at p. 960.)  Accordingly, the notion that Petitioner

20   was exercising his right of self-defense as he drove by an area of Western Avenue populated by

21   Petitioner's rival gang was weak.  As noted by the California Court of Appeal, "for the jurors to

22   have accepted this theory, they would have had to conclude that defendants and a third

23   companion drove a stolen car into the heart of enemy gang territory, and, while armed to the

24   teeth, were fired upon by HNS members who, serendipitously, happened to be standing outside."

25   (Slip Op. at p. 23.)

26       Perhaps most importantly, there was direct testimonial evidence that was contrary to

10

1   Petitioner's self-defense argument.  Vue Heu testified that he was at the Western Avenue

2   residence when and where the shooting occurred on February 3, 2002.  He was talking to people

3   including Yee Xiong and Fong Vue.  (See Reporter's Tr. at p. 174.)  Heu testified that they were

4   just hanging out talking when "somebody just came by shoot at us."  (Id.)  He further testified

5   that he saw the taillights of the car that was involved in the drive-by and that he thought it looked

6   like a Toyota Camry.  (Id. at 178-79.)  Yee Xiong also testified that the gunshots came "from the

7   street where the car rode by."  (Id. at 281.)  Thus, the jury also heard direct testimonial evidence

8   which contradicted that Petitioner was acting in self-defense.

9         B.  Claim II

10        In Claim II, Petitioner makes several arguments that counsel was ineffective.  Petitioner's

11  ineffective assistance of counsel arguments can be separated into two separate categories.  First,

12  Petitioner makes several arguments that trial counsel was ineffective in failing to properly cross-

13  examine and question various prosecution witnesses.  Petitioner's second argument is that his

14  trial counsel was ineffective for failing to request an inquiry into Detective Stigerts' purported

15  prohibited communication with the jury.

16        Similar to Claim I, Respondent argues that this Claim is unexhausted.  Claim II followed

17  a similar procedural path as did Claim I.  Petitioner did not raise Claim II during his direct appeal

18  but did raise it in his state habeas petition to the California Supreme Court in October 2009.  As

19  previously stated, that state habeas petition was denied pursuant to Swain, 34 Cal. 2d 300 and

20  Duvall, 9 Cal. 4th 474.  Like Claim I however, the arguments within Claim II can be denied on

21  the merits because Petitioner has failed to show that they are "colorable."

22              i.  Failure to Properly Cross-Examine/Question Witnesses

23        In Petitioner's first argument, he argues that his trial counsel was ineffective when she

24  failed to properly impeach Xiong with prior inconsistent statements he gave to detectives.  As

25  examples, Petitioner asserts that Xiong initially told detectives that he was not a gang member,

26  yet in a subsequent interview admitted he was a gang member.  Petitioner also argues that trial

11

1  counsel should have impeached Xiong because gun shot residue was found on his person, yet he

2  denied to detectives that he fired a gun.

3      The Sixth Amendment guarantees effective assistance of counsel.  In <u>Strickland v.</u>

4  <u>Washington</u>, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

5  ineffective assistance of counsel.  First, the petitioner must show that considering all the

6  circumstances, counsel's performance fell below an objective standard of reasonableness.  <u>See id.</u>

7  at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

8  of reasonable professional judgment.  <u>See id.</u> at 690.  The federal court must then determine

9  whether in light of all the circumstances, the identified acts or omissions were outside the range

10  of professional competent assistance.  <u>See id.</u>

11      Second, a petitioner must affirmatively prove prejudice.  <u>See id.</u> at 693.  Prejudice is

12  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

13  result of the proceeding would have been different."  <u>Id.</u> at 694.  A reasonable probability is "a

14  probability sufficient to undermine the confidence in the outcome."  <u>Id.</u>  A reviewing court "need

15  not determine whether counsel's performance was deficient before examining the prejudice

16  suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

17  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

18  followed."  <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (citing <u>Strickland</u>, 466 U.S. at

19  697).

20      In this case, it is easier to dispose of this ineffective assistance of counsel argument on the

21  prejudice prong of the <u>Strickland</u> test.  For the reasons described in <u>supra</u> Part V.A, the case

22  against Petitioner was strong.  By way of example only, Lao was captured upon attempting to

23  flee the Camry and his fingerprints were found on the Camry as well.  He was in a stolen car,

24  heavily armed driving through the heart of enemy gang territory.  Furthermore, the fact that

25  Xiong had gun shot residue on his person did not necessarily support Petitioner's theory that he

26  was acting in self-defense.  While the gun shot residue may have indicated that Xiong fired a

gun, it does not necessarily follow that Xiong fired first.  Several witnesses testified at trial which

indicated that the shots first came from the vehicle.  Had counsel attempted to impeach Xiong

with the gun shot residue evidence, it would not have, to a reasonable probability changed the

outcome of the proceedings in light of the evidence which strongly implicated Petitioner in the

charged crimes.

> Next, Petitioner makes the following argument:

>> A witness, a Mr. Vang Vang gives a statements on June 7, 2002 to
>> SPD Inv. Mark Rall to have witness a black car driving southbound
>> on Western Ave. through the kitchen window while washing his
>> hands.  This is directly contradicted by Mr. Xiong.  Xiong puts
>> Vang Vang right beside him in his 2/5/02 statement to Det. Lee, at
>> the time of the shooting.  Vang Vang clothing, at the request of
>> defense counsel, should have been tested for G.S.R. thus proving
>> he lied to detectives.  The credibility of both Xiong and Vang Vang
>> should have been challenged by defense counsel.

(Pet'r's Am. Pet. at p. 8.)  At the outset, a review of the trial transcript indicates that no witness

named "Vang Vang" testified at trial.  Thus, Petitioner's fails to explain how counsel could be

ineffective for not attacking the credibility of a witness who did not testify at trial.  Furthermore,

this ineffective assistance of counsel claim can be denied under the Strickland prejudice prong.

The evidence against Petitioner in this case was strong.  Direct testimonial evidence weakened

Petitioner's self-defense theory that he relied on at trial.  The evidence included several

eyewitness accounts of the shooting and also included Petitioner eventually being captured

fleeing from the Camry.  Furthermore, as previously described Petitioner's self-defense theory

was further weakened in light of his traveling in a stolen vehicle in rival gang territory.

Petitioner failed to show to a reasonable probability that the outcome of the proceeding would

have been different under this ineffective assistance of counsel argument.

> Third, Petitioner asserts that gun shot residue tests should have been conducted on Vue

Heu.  Similar to Petitioner's other ineffective assistance of counsel arguments, he fails to show

prejudice.  As Petitioner indicates, gun shot residue was found on Xiong which fit the profile of

somebody shooting a weapon.  (See Reporter's Tr. at p. 833.)  Petitioner fails to explain

1   therefore, how testing for gun shot residue on Vue Heu would have changed the outcome of the

2   proceeding to a reasonable probability.  There was already evidence in the record that a victim

3   may have fired his weapon based on the gun shot residue findings.  A test of Vue Heu would

4   have therefore been cumulative.

5          Next, Petitioner argues that "[o]f the 15 or so witnesses on the street when Officer

6   Michael Boyd arrived to secure the scene and collect evidence, no were interviewed.  Petitioner

7   counsel failed to even question police detectives as to why?"  (Pet'r's Pet. at p. 10.)  Petitioner

8   comes forward with no evidence indicating what testimony these purported fifteen witnesses

9   would have provided.  Therefore, he fails to show to a reasonable probability that the outcome of

10  the trial would have been different had trial counsel inquired into why these witnesses were not

11  interviewed by the police.

12         Petitioner also argues that trial counsel did not argue that the victims fired first in this

13  case.  (See Pet'r's Am. Pet. at p. 11 ("Based on the evidence that the alleged 'victims' actually

14  fired weapons, [whether] aggressively or defensively, Xiong denied that "their" side had fired at

15  all.  In sum, there was evidence that the gang members on the street fired first, thus petitioner

16  only acted in imperfect self[-]defen[s]e.  [¶]  Defense counsel never raised any of these points

17  during trial, therefor[e] denying petitioner an effective defense.").)  Contrary to Petitioner's

18  assertion, trial counsel did argue that the victims fired first.  During her closing argument,

19  Petitioner's trial counsel asserted the following:

20              So what does that mean?  It means the car is travelling northbound.
             Before it gets to the house, it is struck by the bullets coming from
21              in front of 3212.  It proceeds beyond the house and fires back.  [¶]
             And what does that tell you?  That tells you that the people at the
22              house fired first.  No other conclusion.  That's based on physical
             evidence.  Physical evidence does not lie.  You can't change it.
23              That's what it is.  Based on the testimony of the officers, location
             of those things, it is clear that the only reasonable interpretation is
24              that the bullets were fired into the car first.

25  (Reporter's Tr. at p. 1265-66.)  Furthermore, Petitioner's trial counsel noted to the jury that

26  Xiong had gun residue on his hands and fired.  (See id. at p. 1267).  Thus, counsel was clearly

1  not ineffective as she did in fact make these arguments on Petitioner's behalf.  Furthermore, as

2  previously noted above, the case against Petitioner was strong and his theory of self-defense was

3  weak such that any purported error by trial counsel would not have, to a reasonable probability

4  changed the outcome of the trial.

5                    ii.  Failure to Inquire into Detective Stigerts' Communication with the Jury

6            In his final argument with Claim II, Petitioner asserts the following:

7                 On July 20th, 2005 at petitioner's trial, one of the prosecution
                  witness, Detective Stigerts made illegal and prohibited
8                 communication with the jurors by talking to the jurors but when
                  this matter was brought to the attention of the petitioner's counsel,
9                 petitioner's counsel failed to request inquiry into the prohibited
                  communication that may have infected the jurors and caused
10                prejudice.  Petitioner's counsel fail [sic] below an objective
                  standard of reasonableness under prevailing professional norms
11                and a reasonable probability existed that, but for counsel's failings,
                  defendant would have received a more favorable result.

12

13  (Pet'r's Pet. at p. 12.)

14          Petitioner's argument that his trial counsel did not inquire into the alleged improper

15  communication between Detective Stigerts and the jury is directly contradicted by the record.  In

16  the middle of trial, Petitioner's counsel stated to the trial court the following:

17                Your Honor, at this time I would just like the record to reflect that
                  earlier in the morning the court had to admonish Detective Stigerts,
18                who has been present as the DA's investigative officer, because she
                  had approached the jury and made some comments to the
19                jury.  [¶]  And, also, there was some conversation about – between
                  the prosecutor and Detective Stigerts about pulling pictures, which
20                the court also admonished the detective about.

21  (Reporter's Tr. at p. 510.)  The trial judge responded that:

22                All right.  I will indicate for the record that one of the jurors spilled
                  a large cup of coffee.  And we had that wiped up, and I think the
23                detective said something to the juror about the coffee.  I
                  admonished her that – just to not have any contact with the jurors
24                even though it was unrelated to the case.

25                I think it was just a mistake on her part.  I do not find that she in
                  any way intended to ingratiate herself with the jurors or did
26                anything that would amount to a mistrial.  She was admonished to

                                                    15

1
          not have any contact.  Again, it was an incidental comment about a
          spill of coffee.

2

3
          And I did just caution the DA and the detective to be careful when
          they're conferring just because we're in a crowded courtroom and
          to make sure that they either communicate by notes or that she

4
          whisper directly in his ear so nothing could possibly be overheard.

5
(Id. at 510-11.)

6
     Here, the trial court was put on notice by Petitioner's counsel about the purported

7
communication between Detective Stigerts and the jury.  Therefore, Petitioner cannot meet the

8
first prong of the Strickland test as counsel did in fact raise the issue with the trial court.

9
     C.  Claim III

10
     In Claim III, Petitioner argues that co-defendant Her's trial counsel was ineffective during

11
his closing argument.  Specifically, Petitioner argues that Her's counsel was ineffective when he

12
misspoke during closing argument by effectually defeating Petitioner's self-defense theory.

13
Petitioner objects to the following italicized statement by Her's trial counsel during his closing:

14
          The next circumstance to consider to consider is that it's clear from
          the physical evidence and surrounding circumstances that the Yee

15
          Xiong group had a minimum of three guns out there, maybe more
          than three guns.

16

17
          We know there was a .40 caliber casing in the bumper and spare
          tire of the Toyota that were removed, the projectiles, not the
          casings, the projectiles.

18

19
          There was a .38 caliber casing, remember, in the house across the
          street, 3225 Western?  There was a .38-caliber projectile that was
          recovered there.

20

21
          There is a .45-caliber casing that is on the lawn right where they
          were, if you remember that testimony, that there was a casing that
          was found on the lawn.

22

23
          So right there you got three different firearms.

24
          Now, there was some indication that one of the .45-caliber casings,
          that it had soil and mud on it, but it's realistic that that would occur
          – we are talking about a night where there's a lot of dew.  It's cold

25
          out.  We know there were numerous police officers in that area,
          and the important part there is that casing wasn't found until either

26
          a day or two later by Detective Keller.

So it looked – there was all kinds of law enforcement out there in the interim.  It is reasonable that they would have embedded it or stepped on it.

And that is consistent also with – they didn't the actual – remember, there was – besides the .45-caliber casing there, there was a . .32-caliber projectile that they determined had been fired from the vehicle that was also basically in the same area?  They didn't even – they didn't find that until a day or two later, which means some law enforcement officer probably stepped on that one also, and it got embedded.

And the fact that the .45-caliber casing had soil and mud is really inconsequential.  It's reasonable it would because all of these people stepping in that area for this day or two before it actually got found.

So we have those three guns at least, but we also know there was a projectile fired through the back windshield of the Toyota and came out the front windshield.  That projectile was never recovered.  We don't know what firearm was used for that.  We know from the evidence that there was a projectile fired through, as I just went over, the rear passenger window.  *That projectile was never fired – recovered.*  So we don't know what firearm was fired for that.

A reasonable interpretation for all that is there is at least three guns that they are using out there and possibly as many – up to five guns, because all of those, the .40-caliber casing, the .38 caliber projectile that was from the downspout, and the .45-caliber casing that was one the lawn, do you remember, Faye Springer said some of them were fired or ejected from the recovered firearms.

So none of those came from the guns that had been in the vehicle.  They all had to be from firearms that were out there with this Yee Xiong group.

(Reporter's Tr. at p. 1227-29 (emphasis added).)

Petitioner contends that by Her's counsel pausing on the words "never fired," that it effectively defeated Petitioner's self-defense argument.  Petitioner also complains to the following italicized language used by Her's counsel during his closing argument:

We don't know actually what happened, that the burden of proof is solely on the prosecution.  And that is one of the guarantees that our country has set up, that the burden is on the prosecution to assure that people are not wrongfully convicted of crimes.

*And one of the reasons for that is if the burden was on, let's say,*

17

1

2

3

4

> *Kinson Her to prove it, which is true in some other countries, that it's very difficult to prove a negative, as we all know. The negative being, well, we didn't shoot first, that these other guys shot first. It's very difficult if the burden was on him to prove that.* And that's one of the guarantees the framers of our Constitution cam up with to assure that people were not convicted wrongfully.

5

(Id. at p. 1195.)

6          Petitioner argues that this statement by Her's counsel during his closing argument told the

7  jury that it was difficult for Petitioner to prove self-defense.

8          Similar to Claim I, Petitioner did not raise this Claim on direct appeal.  Petitioner raised

9  this issue in his state habeas petition to the California Supreme Court which denied the petition

10  without comment but citing to Duvall, 9 Cal. 4th at 474 and Swain, 34 Cal. 2d at 304.  These

11  citations indicate that the California Supreme Court denied the state habeas petition because it

12  was not alleged with sufficient particularity, making it procedurally deficient.  See Kim, 799 F.2d

13  at 1319.  Nevertheless, for the following reasons, Claim III can be denied on the merits because it

14  is not "colorable."  See Cassett, 406 F.3d at 624.

15          The requisite standard for establishing an ineffective assistance of counsel claim was set

16  forth in supra Part V.B.  Nevertheless, in Claim III, Petitioner does not allege that his trial

17  counsel was ineffective.  Instead, Petitioner argues that his co-defendant's, Kinson Her, trial

18  counsel was ineffective in his closing argument.  Petitioner has cited to no United States

19  Supreme Court nor has the undersigned found any United States Supreme Court authority which

20  states that a petitioner can bring an ineffective assistance of counsel claim against a co-

21  defendant's counsel purported ineffectiveness.  Thus, Petitioner fails to show a "colorable"

22  federal habeas claim with respect to this Claim.

23          Even if Claim III alleged that Petitioner's trial counsel was ineffective for failing to object

24  to Her's trial counsel's statements during closing argument, Petitioner still would not be entitled

25  to federal habeas relief.  As stated in supra Part V.A, the case against Petitioner was strong such

26  that any purported error on Petitioner's counsel's part in failing to object to Her's counsel's

statements during his closing arguments would not have had an effect on the outcome of the

proceedings to a reasonable probability.  Further reducing any possible prejudice towards the

Petitioner due to Her's counsel's closing argument is the fact that the jury was specifically

instructed that "[s]tatements made by the attorneys during trial are not evidence." and the jury

"must accept and follow the law" as stated by the judge.  (See Reporter's Tr. at p. 1112, 1113.)

The jury is deemed to have followed these instructions.  See Weeks v. Angelone, 528 U.S. 225,

234 (2000).  Thus, Petitioner is not entitled to federal habeas relief on Claim III.

D.  Claim IV

In Claim IV, Petitioner argues that his right to a fair trial was violated when Detective

Stigerts had an illegal and prohibited communication with the jury.  Respondent argues that this

Claim is unexhausted, however, Respondent also states that it can be denied on the merits

because it is not "colorable."  Because this Claim is not "colorable" it can be denied on the

merits without analyzing the lack of exhaustion issue.  The underlying facts of this Claim was set

forth in Her v. Jacquez, Civ. No. 09-612, 2011 WL 1466868 (E.D. Cal. Apr. 18, 2011).  As noted

in Her:

> In the middle of the trial, Defendant Lao's counsel (Ms. Rogers)
> stated to the trial court the following:
>
>> Your Honor, at this time I would just like the record
>> to reflect that earlier in the morning the court had to
>> admonish Detective Stigerts, who has been present
>> as the DA's investigative officer, because she had
>> approached the jury and made some comments to
>> the jury.  [¶]  And, also, there was some
>> conversation about – between the prosecutor and
>> Detective Stigerts about pulling pictures, which the
>> court also admonished the detective about.
>
> (Reporter's Tr. at p. 510)  The trial judge responded that:
>
>> All right.  I will indicate for the record that one of
>> the jurors spilled a large cup of coffee.  And we had
>> that wiped up, and I think the detective said
>> something to the juror about the coffee.  I
>> admonished her that – just to not have any contact
>> with the jurors even though it was unrelated to the

1     case.

2         I think it was a mistake on her part.  I do not find
      that she in any way intended to ingratiate herself
3     with the jurors or did anything that would amount to
      a mistrial.  She was admonished to not have any
4     contact.  Again, it was an incidental comment about
      a spill of coffee.
5
          And I did just caution the DA and the detective to
6     be careful when they're conferring just because
      we're in a crowded courtroom and to make sure that
7     they either communicate by notes or that she
      whisper directly in his ear so nothing could possibly
8     be overheard.

9              (Id. at 510-11.)

10    Her, 2011 WL 1466868, at *26.

11        Unless it is *de minimus*, an unauthorized communication between a juror and a witness or

12    interested party is presumptively prejudicial.  See Caliendo v. Warden Cal. Men's Colony, 365

13    F.3d 691, 696 (9th Cir. 2004).  "A communication is possibly prejudicial, not *de minimus,* if it

14    raises a risk of influencing the verdict."  Id.  "If an unauthorized communication with the juror is

15    *de minimus*, the defendant must show that the communication could have influenced the verdict

16    before the burden of proof shifts to the prosecution."  Id. at 696.  The defendant must offer

17    sufficient evidence to trigger the presumption of prejudice.  See id. at 696.  Factors relevant to

18    this inquiry include "the length and nature of the contact, the identity and role at trial of the

19    parties involved, evidence of actual impact on the juror, and the possibility of eliminating

20    prejudice through a limiting instruction."  Id. at 697-98.

21        As noted in Her, "[t]he state court made a factual finding that the communication

22    between Stigerts and the jury concerned the spillage of a cup of coffee."  2011 WL 1466868, at

23    *26. As the petitioner in Her failed to do, Petitioner in this case also failed to rebut this factual

24    finding by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1) ("In a proceeding

25    instituted by an application for a writ of habeas corpus by a person in custody pursuant to the

26    judgment of a State court, a determination of a factual issue made by a State court shall be

                                        20

presumed correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.")  Detective Stigerts' reference to the jury regarding the spillage of coffee was *de minimus* and innocuous in nature and content.  Petitioner failed to show that the communication was anything beyond *de minimus* such that the communication is not deemed presumptively prejudicial.  Thus, Petitioner is not entitled to federal habeas relief on this Claim as he has failed to show that Claim IV is "colorable."

E.  Claim V

The petition has been construed by Judge Brennan and Judge England as including Claim V.  In the August 12, 2010 findings and recommendations adopted by Judge England, Judge Brennan concluded that Petitioner also raised the following issues in his amended federal habeas petition:

> 1. In a gang case in which the prosecution's theory was that of a "drive by shooting," and in which there was evidence of firing from the alleged victim's side, it is error to instruct in accord with CALJIC No. 5.55 on pretextual self-defense when there was no evidence of intent to provoke the other side, but where the case had to be resolved either as murder or as perfect or imperfect self-defense; and if the giving of CALJIC No. 5.55 was error, did it deprive appellant of his Sixth and Fourteenth Amendment right to a meaningful opportunity to present a defense?
>
> 2. Is the 1997 revision of CALJIC No. 5.17 informing the jurors that imperfect self-defense is unavailable "if the defendant by his unlawful or wrongful conduct created the circumstances which legally justif[ied] his adversary's use of force" an incorrect statement of law, which has not been corrected by CALCRIM 571, which omits this provisio[n], and did the giving of the instruction deprive [Petitioner] of his Sixth and Fourteenth Amendment right to a meaningful opportunity to present a defense?
>
> 3. Do consciousness of guilt and inference of guilt instructions aimed at the defendant alone violate due process?

The last reasoned decision on these issues was from the California Court of Appeal which stated the following:

21

Her and Lao each assign error to the giving of CALJIC No. 5.55. The instruction, which was given over defense objection, told the jury that the right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent need for exercising the right of self-defense if the evidence showed they deliberately drove into the territory of their HNS rivals with the intent to foment a quarrel.

Defendants claim the instruction should not have been given because there was no evidence that they drove by 3212 Western with the *specific intent* to create a pretext for self-defense. We find no reversible error.  First, the instruction was simply part of a packet of self-defense instructions requested by the defense, all of which the court decided to give and some of which conflicted with others.  As the court stated in Olguin: "It was obvious to anyone that not all of those instructions could apply to the case, and the jurors were specifically instructed they were to 'Disregard any instruction which applies to facts determined by you not to exist.' (CALJIC No. 17.31.)"  (Olguin, supra, 31 Cal.App.4th at p. 1381.)  We presume the jury follows the instructions given.  (Ibid.)

The California Supreme Court has also observed that an instruction correctly stating a principle of law but not applicable to the facts of the case is usually harmless, having little or no effect "'other than to add to the bulk of the charge.'"  (People v. Rollo, (1977) 20 Cal.3d 109, 123, quoting People v. Sanchez (1947) 30 Cal.2d 560, 573.)

Second, while there was credible evidence that HNS gang members *returned the fire* of the drive-by shooters, the notion that defendants were exercising their right of self-defense when they drove by the apartment building and riddled it with bullets, is nothing short of fanciful.  For the jurors to have accepted this theory, they would have had to conclude that defendants and a third companion drove a stolen car into the heart of enemy gang territory and, while armed to the teeth, were fired upon by HNS members who, serendipitously, happened to be standing outside.  Aside from the fact that, as Detective Lee pointed out, a shotgun is not a useful weapon to carry around for self-defense, such a scenario defies both logic and common sense.  We conclude there was no substantial evidence to support a jury finding that the occupants of the Camry were exercising their right of self-defense.  (See People v. Shelmire (2005) 130 Cal.App.4th 1044, 1054-1055.)  [FN 7]

> [FN 7]  When asked at oral argument what evidence in the record showed that the victims fired first, counsel for Lao cited only the fact that one bullet entered the side passenger window of the Camry and exited the "back windshield" (*sic*), and expert testimony that one gang feels "disrespected" when a rival gang enters its territory.  We find this far too

flimsy and speculative a basis to support a viable
claim of perfect self-defense.

Because there was no substantial evidence of self-defense, the jury
could not have been misled by the giving of CALJIC No. 5.55 and
the alleged instructional error was harmless.  (People v. Flood
(1998) 18 Cal.4th 470, 491, Cal. Const., art. VI, § 13.)

C.  Imperfect Self-defense

In accordance with the defense request, the jurors were given
CALJIC 5.17, which told them that a person who kills another in
an actual but unreasonable belief in the necessity to defense against
imminent peril is not guilty of murder and can only be convicted of
the crime of voluntary manslaughter.

Defendants take issue with the third paragraph of the instruction,
which states:  "However, this principle [i.e., imperfect self-
defense] is not available, and malice aforethought is not negated, if
the defendant by his unlawful or wrongful conduct created the
circumstances which legally justified his adversary's use of force,
attack or pursuit."  (CALJIC No. 5.17)  While conceding that the
language is lifted 'almost verbatim' from the California Supreme
Court case of In re Christian S. (1994) 7 Cal.4th 768, 773, fn. 1
(Christina S.), Lao launches into a technical, abstract discussion in
which he attempts to show that the sentence is not an accurate
statement of law and should not have been adopted by the
Committee on Standard Jury Instructions.

Preliminarily, we note that defendants requested that the court give
CALJIC 5.17 without qualification.  When defense counsel makes
a conscious and deliberate tactical choice to request a particular
instruction, the rule of invited error applies, and defendant cannot
challenge it on appeal.  (People v. Wader (1993) 5 Cal.4th 610,
658.)  Since there is no claim that counsel requested the instruction
through inadvertence of incompetence, the argument is barred.
In Christian S., supra, 7 Cal.4th 768, the state Supreme Court
declared:  "It is well established that the ordinary self-defense
doctrine – applicable when a defendant *reasonably* believes that
his safety is endangered – may not be invoked by a defendant who,
through his own wrongful conduct (e.g., the defendant who,
through his own wrongful conduct (e.g., the initiation of a physical
assault or the commission of a felony), has created circumstances
under which his adversary's attack or pursuit is legally
justified.  [Citations.]  It follows, a fortiori, that the imperfect self-
defense doctrine cannot be invoked in such circumstances."  (Id. at
p. 773, fn.1.)

In People v. Seaton, (2001) 26 Cal.4th 598, the Supreme Court
reaffirmed this principle, i.e., that where the defendant is the
aggressor and the victim's response is legally justified, defendant

23

may not rely on unreasonable self-defense to reduce a murder charge to voluntary manslaughter.  (Id. at p. 664.)  Although neither Seaton nor Christian S. expressly approve of the third paragraph of CALJIC No. 5.17, it is unmistakable that the state high court stands by it as a correct statement of law.  So do we.  No reversible error is shown . . . .

In a final, catch-all application, Lao contends that CALJIC Nos. 2.03 (wilfully false statement – consciousness of guilt), 2.06 (suppression of evidence – inference of guilt), 2.52 (flight following commission of crime – consciousness of guilt) and 2.51 (motive not an element of crime, but may be considered in weighing guilt) were "argumentative pinpoint instructions, that rendered the instant case fundamentally unfair in violation of the due process clause."

The point of Lao's argument is difficult to fathom.  He concedes that all of the cited instructions have been approved by the California Supreme Court not only as immune from these imputations of impropriety, but as indeed beneficial to the criminal defendant."  Nevertheless, he urges that they combined to skew the case unfairly in favor of the People, because the instructions could equally apply to misconduct by members of the rival HNS gang, yet only defendants were targeted by them.

We reject the argument.  Because the instructions speak only of permissible inferences, they do not remove "from the jury its prerogative of determining the applicability of the instruction" (People v. Anderson (1989) 210 Cal.App.3d 414, 422) and "in no way shift [ ] the burden of proof or destroy [ ] the presumption of innocence; the prosecution must still satisfy the jury of a defendant's guilt beyond a reasonable doubt" (People v. McFarland (1962) 58 Cal.2d 748, 756).  That acts or omissions by HNS gang members might sustain adverse inferences against them is irrelevant.  The jury's task was to determine the guilt or innocence of *defendants*, not to determine the culpability of the parties not charged.  Finally, we do not perceive how the combined effect of the instructions that were concededly proper and applicable to the case can be alchemized into a finding of prejudicial error.

(Slip Op. at p. 22-27.)

        i.  CALJIC 5.55 instruction

        A challenge to a jury instruction solely as an error of state law does not state a claim

cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

24

1    ailing instruction by itself so infected the entire trial that the resulting conviction violates due

2    process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

3    must be considered in the context of the instructions as a whole and the trial record.  See id.  The

4    court must evaluate jury instructions in the context of the overall charge to the jury as a

5    component of the entire trial process.  See United States v. Frady, 456 U.S 152, 169 (1982).

6    Furthermore, even if it is determined that the instruction violated the petitioner's right to due

7    process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

8    influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson,

9    507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or

10   influence in determining the jury's verdict.  See, e.g., Hedgpeth v. Pulido, 555 U.S. 57, 61-62

11   (2008) (per curiam).

12          As noted by the California Court of Appeal on direct appeal, the pretextual self-defense

13   instruction was part of a larger jury instruction detailing the theory of self-defense.  Taken as a

14   whole, the instruction did not so infect the trial so as to violate Petitioner's due process rights.

15   The gang expert testified about the territories of the various gangs and how something like what

16   occurred in this case could happen by traveling in a rival gang's "territory."  Additionally, the

17   jury was specifically instructed that to "disregard any instruction which applies to the facts

18   determined by you not to exist."  (Reporter's Tr. at p. 1297.)  A jury is presumed to have

19   followed its instructions.  See Weeks, 528 U.S. at 234.  If the jury did not believe that Petitioner

20   was seeking a quarrel, this instruction would not have been considered by the jury in determining

21   its verdict.  For these reasons, Petitioner is not entitled to federal habeas relief on this Claim.

22          ii.  CALJIC 5.17 Instruction

23   The jury was also instructed as follows at trial:

24          A person who kills another person in the actual but unreasonable
             belief in the necessity to defend against imminent peril to life or
25          great bodily injury, kills unlawfully but does not harbor malice
             aforethought and is not guilty of murder.  This would be so even
26          though a reasonable person in the same situation seeing and

25

1    knowing the same facts would not have had the same belief.  Such
2    an actual but unreasonable belief is not a defense to a crime of
     voluntary manslaughter.

3    As used in this instruction, an "imminent" peril or danger means
     one that is apparent, present, immediate and must be instantly dealt
4    with, or must so appear at the time to the slayer.

5    *However, this principle is not available, and malice aforethought
     is not negated, if the defendant by his unlawful or wrongful
6    conduct created the circumstances which legally justified his
     adversary's use of force, attack or pursuit.*
7
     This principle applies equally to a person who kills in purported
8    self defense or purported defense of another person.

9    (Clerk's Tr. at p. 233 (emphasis added).)  Petitioner argues that the italicized portion of the jury

10   instruction given above is an erroneous statement of law.

11          At the outset, how California defines self-defense, imperfect or otherwise, involves a

12   question of state law and as such is not cognizable in federal habeas proceedings.  See Estelle,

13   502 U.S. at 67-68.  Additionally, CALJIC NO. 5.17 correctly recites California law on the issue.

14   Videau v. Hedgepeth, Civ. No. 07-3838, 2009 WL 1308882, at *3 (N.D. Cal. May 11, 2009)

15   (stating that CALJIC No. 5.17 "is a correct recitation of California law") (citing In re Christian

16   S., 7 Cal. 4th 768, 774 n. 1, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (1994)).  As the California

17   Supreme Court explained in Christian S.:

18   It is well established that the ordinary self-defense doctrine –
     applicable when a defendant *reasonably* believes that his safety is
19   endangered – may not be invoked by a defendant who, through his
     own wrongful conduct (e.g., the initiation of a physical assault or
20   the commission of a felony), has created circumstances under
     which his adversary's attack or pursuit is legally justified.  It
21   follows, a fortiori, that the imperfect self-defense doctrine cannot
     be invoked in such circumstances.
22
23   7 Cal. 4th at 773 n. 1, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (emphasis in original) (internal citations

24   omitted).  Thus, Petitioner fails to show that his due process rights were violated when the jury

25   was instructed using CALJIC 5.17.  Cf. Hicks on behalf of Feiock v. Feiock, 485 U.S. 624, 629-

26   30 (1988) ("Although petitioner marshals a number of sources in support of the contention that

1    the state appellate court misapplied state law . . . the California Supreme court denied review of

2    this case, and we are not free in this situation to overturn the state court's conclusions of state

3    law.")

4                        iii.  Consciousness of Guilt Instructions

5            Finally, Petitioner objects to the consciousness of guilt instructions with respect to

6    CALJIC 2.03, 2.06, 2.51 and 2.52.  CALJIC 2.03 states that:

7                    If you find that before this trial a defendant made a willfully false
                     or deliberately misleading statement concerning the crimes for
8                    which he is now being tried, you may consider statement as a
                     circumstance tending to prove a consciousness of guilt.  However,
9                    that conduct is not sufficient by itself to prove guilt, and its weight
                     and significance, if any are for you to decide.
10

11   CALJIC 2.06 states that:

12                   If you find that a defendant attempted to suppress evidence against
                     himself in any manner, such as by concealing evidence, this
13                   attempt may be considered by you as a circumstance tending to
                     show a consciousness of guilt.  However, this conduct is not
14                   sufficient by itself to prove guilt, and its weight and significance, if
                     any, are for you to decide.
15

16   CALJIC 2.51 states that:

17                   Motive is not an element of the crime charged and need not be
                     shown.  However, you may consider motive or lack of motive as a
18                   circumstance in this case.  Presence of motive may tend to
                     establish the defendant is guilty.  Absence of motive may tend to
19                   show the defendant is not guilty.

20   Finally, CALJIC 2.52 states that:

21                   The flight of a person after the commission of a crime, is not
                     sufficient in itself to establish his guilt, but is a fact which, if
22                   proved, may be considered by you in the light of all other proved
                     facts in deciding whether a defendant is guilty or not guilty.  The
23                   weight to which this circumstance is entitled is a matter for you to
                     decide.
24

25   Petitioner argues that these instructions had the affect of throwing the "prestige" and "weight" of

26   the court behind the prosecution.  Contrary to Petitioner's assertions, the jury instructions cited

                                            27

1   above and read to the jury did not violate Petitioner's Constitutional rights.  The instructions

2   merely advised the jury that items such as making false statements, attempting to suppress

3   evidence, motive and flight may be considered in deciding whether Petitioner was guilty.

4   However, in each instruction, the jury was also told that each individual item evidence was not

5   by itself sufficient to support a guilty finding.

6          Several courts have analyzed whether these instructions violate a petitioner's

7   constitutional rights.  By way of example only, in Turner v. Marshall, 63 F.3d 807, 820 (9th Cir.

8   1995), overruled on other grounds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999), the Ninth

9   Circuit expressly stated that CALJIC No. 20.3 did not violate a petitioner's constitutional rights.

10  The Ninth Circuit explained that, "[s]o long as the instruction does not state that inconsistent

11  statements constitute evidence of guilt, but merely states that the jury may consider them as a

12  consciousness of guilt, the instruction would not violate constitutional rights.  Because CALJIC

13  No. 2.03 fits this requirement, we find no constitutional error."  Turner, 63 F.3d at 820.  The

14  instructions cited above similarly stated that the jury may consider them as consciousness of guilt

15  but not evidence of guilt.  Thus, Petitioner fails to show that his due process rights were violated

16  through these jury instructions.  See also, Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002)

17  (noting that the flight instruction clarifies that it alone is insufficient to establish guilt and that

18  giving this instruction did not render petitioner's trial fundamentally unfair); see also, Nguyen v.

19  Evans, Civ. No. 07-3979, 2009 WL 799394, at *15 (N.D. Cal. Mar. 24, 2009) (no instructional

20  error in giving CALJIC 2.03, 2.06 and 2.52 as the instructions were not biased towards the

21  prosecution because "[t]he instructions did not posit the existence of misleading statements,

22  concealment of evidence, or flight, but instead left both the existence and significance of those

23  circumstances to the jury.  Further, the jury was instructed that it 'may' but did not have to

24  consider the event as tending to prove consciousness of guilt.  And most importantly, the jury

25  was instructed as to each circumstance (i.e., misleading statements, concealment of evidence, and

26  flight) that it was not alone enough to prove guilt."); Fanady v. Evans, Civ. No. 08-963, 2008

28

1   WL 5220218, at *7 (E.D. Cal. Dec. 12, 2008) (explaining that there was no instructional error in

2   giving CALJIC Nos. 2.03, 2.06 and 2.52 because "[a]ll of the instructions were properly phrased

3   n permissive, not mandatory terms, as the jury was instructed . . . . that it may, but was not

4   required to, infer consciousness of guilty from false statements and/or suppressing evidence, or

5   guilt by evidence of flight by defendant.  In addition, the jury was specifically instructed that

6   consciousness-of-guilt or guilt evidence was not sufficient in itself to support a finding of guilt,

7   and any weight to give to such evidence was the exclusive province of the jury.  Moreover, the

8   trial court did not single out any particular testimony by defendant and the determination of

9   whether the jury found such conscious-of-guilt evidence was left open for the jury to

10  determine."), report and recommendation adopted by, 2009 WL 330366 (E.D. Cal. Feb. 10,

11  2009).

12          Similarly, CALJIC 2.51, or the motive instruction, did not violate Petitioner's

13  Constitutional rights.  The instruction simply explained to the jury that motive was not an

14  element of the crime and that it need not be shown.  The jury was specifically instructed with the

15  requisite elements that needed to be proven to find the Petitioner guilty of the charged crimes.

16  Petitioner does not show that the standard motive jury instruction violated his due process rights

17  by making his trial fundamentally unfair.

18          For the foregoing reasons, none of Petitioner's jury instructional error arguments merit

19  federal habeas relief.  Claim V should be denied.

20              VI.  PETITIONER'S REQUEST FOR APPOINTMENT OF COUNSEL

21          Petitioner requests the appointment of counsel.  There currently exists no absolute right to

22  the appointment of counsel in habeas proceedings.  See, e.g., Nevius v. Sumner, 105 F.3d 453,

23  460 (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any

24  stage of the case "if the interests of justice so require."  In the present case, the interests of justice

25  do not so require to warrant the appointment of counsel.  Accordingly, Petitioner's request for the

26  appointment of counsel is denied.

VII.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Petitioner's request for the appointment of counsel is DENIED.

For all of the foregoing reasons, IT IS RECOMMENDED that the amended petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  October 25, 2011

_____
TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE