Houa Lao
F-08659
CSP-SACRAMENTO
P.O. Box 290066
Represa, CA 95671

FILED

DEC 16 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

Houa Lao,                          ) Case No.: No. CIV S-08-3171 EFB P
                                   )
            Petitioner,            ) Objections to Magistrate
                                   ) Judge's Finding and
    vs.                            ) Recommendation
                                   )
Tim Virga, Warden                  )
                                   )
            Respondent.            )
_____)

    Petitioner, proceeding pro se is filing the following

Objections to the Magistrate's Findings and Recommendations.

Petitioner will submit objections on the following claims:

(1) Insufficient evidence to convict petitioner of murder and

attempted murder, (2) Ineffective Assistance of counsel, and

(5) Self Defense.  Petitioner will not submit objection to

claims 3 and 4.

                        -INTRODUCTION-

    **On October 26, 2011, the magistrate in this matter filed a**

**"Report and Recommendation"** which recommended that petitioner's

application writ of habeas corpus be denied.  The notice at the

conclusion of the Report and Recommendation provided that within

twenty-one (21) days after being served with these findings, any

party may file written objections with the court and serve a

copy on all parties.  Pursuant to said notice, petitioner file

and serves these objections to the Magistrate's Report and

                              1

Recommendation.

(1) INSUFFICIENT EVIDENCE TO CONVICT PETITIONER OF MURDER AND ATTEMPTED MURDER.

In Finding and Recommendation 10, 3-8, petitioner disagree, in trial, surviving victim Yee Xiong solemnly swear to testify to the truth.  He testify he did not know who shot at him (See Ct. Rptr. Tr.'s page 300 at 17), also (Ct. Rptr. Tr.'s at page 328, 14-28). 541 F.3d 652, Tucker V. Palmer, C.A.6 (Mich.) 2008---"There was no evidence either eyewitness testimony or physical evidence presented that [Tucker] was actually in his accuser's home, nor was there evidence which connected [Tucker] to the rings that were taken."  Parker V. Renico, 506 F.3d 444, 452 (6th Cir. 207), the defendant fled from law enforcement and was actually in the car with other defendants who had conspired to kill and had just shot the victim… on habeas review, the federal district court finding insufficient evidence to convict the defendant,  Also, see e.g., Brown V. Palmer, 441 F.3d 347, 352 (6th Cir. 2006), and Fuller V. Anderson, 662 F2d 420, 424 (6th Cir. 1981).

There is no history of threats by petitioner to attack these individuals, Yee Xiong and Fong Vue.  Petitioner live in Northside and goes to the same school with victim Yee Xiong and never have any trouble with the victim (see Exhibit A.) The shot gun shells found in petitioner closet  is mere facts.  Petitioner did admitted in his interview with Det. Keller that his

2

1   father must have left in there during one of his sleep over.
2   (See Exhibit B).  There's also facts petitioner fingerprint
3   found on the door of the Camry, Petitioner did not deny this
4   facts. (See Exhibit C)  Petitioner has no history of violence.
5   Det. Aaron Lee also testify that in his intelligence gathering,
6   he had never heard of petitioner Houa Lao's name.(see Exhibit D)
7   Petitioner was never validated as MOD.  The letter petitioner
8   wrote to his ex-girlfriend signed MOD did not actually say he
9   was a member (see Exhibit E).  Det. Lee's testimony was pre-
10  judice and that Lee's opinion was inadmissible because the
11  hypothetical question was not "rooted from the facts shown by
12  the evidence"—People V. Gardeley (1996), 14 Cal 4th 605.  Peti-
13  tioner was never validated as MOD.  Petitioner co-defendant was
14  a validated member of YMS street gang.  As to the third unknown
15  suspect, the "gang expert", Lee also labeled as being a member
16  of MOD.  There is no identity to the third suspect, so there is
17  no evidence that the third suspect is a member of MOD.  Det.
18  Lee's opinion is clearly not rooted from the facts. People V.
19  Mendez 188 Cal. App. 4th 47. (Cal. App. 2 Dist. 2010).

20      Even assuming petitioner was in the Toyota at the time of
21  the shooting, the evidence demonstrated that the people at
22  Western Ave. had fired shots first, and that the people inside
23  the vehicle returned shots.  This theory of self-defense is
24  supported by the evidence the prosecutor presented at trial.
25  There were also two (2) different caliber casings found near

3

the proximity of Vue and Xiong at the scene of the shooting. There were two shots first followed by more shots. The gun powder residue were detected on the hands of Yee Xiong. The right side of the back passenger window had been blown out. As indicated by the trajectory analysis, the bullet would have to exit an open portal in the vehicle. The back windshield had also been blown out. Petitioner disagree what stated in Finding and Recommendation page 10, 14. Petitioner's self-defense argument was weakened by witness Det. Lee testified at trial that H.N.S. territory includes Western Ave. and you do not go into the rival gang's territory and that if you do, "Something like this may happen" (id. at page 960). This prove to be fact that if you're not H.N.S. and go into their territory, they will shoot at you base on this testimony. He also testified something similar to this case about a victim and his friends driving up and down the suspect street. The suspects noticed and grabbed a couple of handguns and fired at them (See Exhibit F). Det. Lee also testify there was several people who live in the Strawberry Manor area that are not friendly with H.N.S. They repeatedly have gotten beaten up. (See Exhibit G)

In Finding and Recommendation page 11, 1-7: Vue Hue testify were just hanging out talking. Victim Yee testify there was a lot of people, some standing around the house (see Rptr.'s Tr. page 319). Det. Lee stated that H.N.S. were hanging out by the boat all the time (see Exhibit H). A witness May Vang made

4

1  a statement (see Exhibit I) her sister-in-law called the police

2  on Friday night about some shooting that went on outside.  Then

3  she called the police that night when the shooting happened

4  again.  This prove that there was a lot more shooting happened

5  before in this area—that's why the victim's gang hang out there

6  and watch for any suspicious vehicles driving by—and recognized

7  the car as enemies and opened fire at the car.  Witness, Vang

8  Vang, made a statement to SPD Inv. Mark Rall (see Exhibit J) he

9  observed a black car driving Southbound down Western Ave. while

10  washing his hand at the sink.  When the shooting happen he

11  observed the same black car driving Northbound on Western Ave.

12  at the same time he heard the gunshots.  However, Yee Xiong

13  stated Vang Vang was right next to him when the shooting starts

14  (see Exhibit K).  This proves that Vang Vang lied and they were

15  both outside and saw the black car and recognized it as

16  "enemies" and immediately opened fire at the car.  There was no

17  guns found at the scene, but there were .45 caliber casings

18  found near the victims where they lay at.  There were also

19  evidence that there was a .38 caliber projectile and a .38

20  caliber casing found.  The record also shows that both victims

21  have been tested positive with gun powder residue on their

22  hands.  Surviving victim Yee Xiong admitted he had two (2)

23  felony priors for carrying a .38 (see Exhibit L) and he is on

24  probation for gun charges and violation.

25        The evidence (offered) showed nothing more than that

5

1    petitioner was captured upon attempting to flee the Camry and

2    his fingerprints were found on the Camry as well. He was in a

3    stolen car heavily armed driving through the heart of enemy gang

4    territory.

5        There was no evidence presented petitioner was in the car

6    when the shooting happened.  The evidence failed to show the

7    petitioner had committed the shooting.  Thus, it was insuffi-

8    cient to find petitioner guilty on a direct theory of liability.

9    "When there is insufficient evidence to establish guilt beyond

10   a reasonable doubt, the defendant must be found not guilty."

11   Jackson V. Virginia (1979 443 U.S. 307.  See Hopson V. Foltz,

12   No. 86-1155, 1987 WL 37432 (6th Cir. May 20, 1987), granted a

13   writ of habeas corpus based on insufficiency of the evidence.

14   In Hopson, the petitioner had been convicted of aiding and

15   abetting first degree murder based on evidence that he and the

16   victim had argued shortly before the victim was killed, that

17   he was present when the victim was killed, and there he may have

18   known that the perpetrator intended to harm the victim.  Also,

19   see 662 F.2d 420, Fuller V. Anderson, (C.A.6) (Mich)1981), 567-

20   F.3d 540, U.S. V. Begay, (C.A. 9 (Ariz.) 2011), 568 F.3d 287,

21   O'Laughlin V. O'Brien, (C.A. 1 (Mass.)2009).  Juanh V. Allen

22   408 F.3d 1262 (9th Cir. 2005). 570 F.3d 414, Foxworth V. St.

23   Amond, (C.A. 1 (Mass.) 2009), United States V. Dbres, 61 F.3d

24   967, 970 (1st Cir. 1995).

25

6

(2) INEFFECTIVE ASSISTANCE OF COUNSEL.

In Finding and Recommendation page 13, 6-22, Vang Vang was not present to testified at trial because trial counsel fail to call upon him.  Vang Vang was one of the witnesses for the people (see Exhibit M).  He was ordered to appear in court to testify on August 1st, 2005 (see Exhibit N).  He should have been cross examined to what he really witnessed on the night of the shooting.  Deficient performance/Ineffective assistance of counsel.  Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance", and judicial scrutiny of counsel's performance must be highly deferential."  Id. at 689, defense counsel must, "at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client", Sanders V. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (emphasis in original); see also Jennings V. Woodford, 290 F.3d 1006, 1013 (9th Cir. 2002).  A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney "neither conduct[s] a reasonable investigation nor makes a showing of strategic reasons for failing to do so."  Sanders, 21 F.3d at 1456; see also Phillips V. Woodford, 267 F.3d 966, 980 (9th Cir. 2001).  Thus, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  The failure to investigate is especially egregious when a defense

7

1  attorney fails to consider potentially exculpatory evidence.
2  See Lord V. Wood, 184 F.3d 1083, 1093 (9th Cir. 1999) ("A lawyer
3  who fails adequately to investigate, and to introduce into evid-
4  ence, information that demonstrates his client's factual inno-
5  cence, or that raises sufficient doubts as to that question to
6  undermine confidence in the verdict, renders deficient perfor-
7  mance/Ineffective assistance of counsel.")

8      On June 7th, 2002, Vang Vang made a statement to Inv. Mark
9  Rall stating that while he was washing his hands, he saw a black
10  car driven Southbound on Western Ave. through the kitchen window.
11  One minute later he heard gunshots and saw the same black car
12  driven Northbound.  This was directly contradictory to victim
13  Yee Xiong statement with Det. Aaron Lee--that Vang Vang was right
14  beside him (see Exhibit K).  Thus proving he (Vang Vang) lied to
15  investigator knowing he was out side during the shooting.  It is
16  reasonable to believe that the victim's gang recognized the people
17  in the car as enemy and opened fire at the car.  At least numer-
18  ous other witnesses to the shooting were known to the defense
19  attorney at the time of the preliminary hearing.  See Avila V.
20  Galaza, No. 01-55149, 2002 WL 1602508, at *5-6 (9th Cir. July 22,
21  2002) (Holding in an attempted murder case in which the defendant
22  was accused of shooting at two individuals, that the defense
23  attorney rendered deficient performance/Ineffective assistance
24  of counsel because he failed to interview a number of potential
25  eyewitnesses to the shooting); Harris V. Wood, 64 F.3d 1432,

8

1435-36 (9th Cir. 1995) (citing as deficiencies counsel's failure
to retain an investigator and failure to interview numerous other
people identified in police reports).  Counsel's failure to inter-
view potential eyewitnesses to a shooting when his client was
accused of being the shooter constituted deficient performance/
Ineffective assistance of counsel; see Johnson V. Baldwin, 114
F.3d 835, 837-40 (9th Cir. 1997) (holding that defense counsel's
failure to talk to more than two witnesses prior to trial cons-
tituted deficient performance); United States V. Tucker, 716 F.2d
576, 584 (9th Cir. 1983) (holding that the failure to interview
or attempt to interview key prosecution witnesses constitutes
deficient performance); Baumann V. United States, 692 F.2d 565,
580 (9th Cir. 1982) ("We have clearly held that defense counsel's
failure to interview witnesses that the prosecution intends to
call during trial may constitute ineffective assistance of coun-
sel.")  Also, see Eggleston V. United States, 798 F.2d 374, 376
(9th Cir. 1986).  Clearly established federal law, and thus peti-
tioner was entitled to federal habeas relief from his conviction;
court failed to consider whether counsel made reasonable profes-
sional judgment to limit his investigation of victim and fact
that victim was reluctant to identify his shooter suggested that
he might have made statements that would have exculpated peti-
tioner or raised doubts about his guilt.  U.S.C.A. Const. Amend.
6; 28 U.S.C.A. §2254(d)(1).  See Strickland, 466 U.S. at 691,
104 S. Ct. 2052; see also Jones V. Wood 114 F.3d 1002, 1011 (9th

9

Cir. 1997).   Gomez V. Beto, 462 F.2d 596, 597 (5th Cir. 1972)
("When a defense counsel fails to investigate his client's only
possible defense, although requested to do so by him; and fails
to supoena witnesses in support of the defense, it can hardly be
said that the defendant has had the effective assistance of
counsel.").   The fact that a witness might not appear credible at
trial is not a reasonable basis for failing "to identify or
attempt to interview" him.   Avila, 297 F.3d at 920; see also
Riley V. Payne, 352 F.3d 1313, 1324 (9th Cir. 2003)

Vang Vang was also at the County Main Jail in Sacramento
with the petitioner in the same "pod" before he got transfer to
Rio Cosumnes Correction Center.   **He'd stated to petitioner that
he don't remember seeing petitioner on the news.   Petitioner bro-
ught this news to the attention of his counsel during one of
their visitings. Petitioner trial responded that it's not neces-
sary and made no effort to investigate nor attempt to find out
what Vang Vang really witnessed before abandoning this possible
defense.   Petitioner trial counsel present no witness at trial.**

(5) SELF DEFENSE

Petitioner resubmits and reasserts all arguments and auth-
orities, incorporating by reference as though fully set forth
herein, contained in his aforementioned original Petition For Re-
view, dated January 2, 2008. (See Exhibit O).   "Where the origi-
nal aggressor is not guilty of a deadly attack, but of a simple
assault or trespass, the victim has no right to use deadly or

10

other excessive force... if the victim uses such force, the
aggressor's right of self-defense *202 arises..." (1 Witkin &
Epstein, Cal. Criminal Law (3d ed. 2000) Defenses §75, p. 410),
or its corollary, "If however, the counter assault be so sudden
and perilous that no opportunity be given to decline or to make
known to his adversary his willingness to decline the strife, if
he [116 Cal. App. 4th 302] cannot retreat with safety, then as
the greater wro ng of the deadly assault is upon his opponent, he
would be justified in slaying, forthwith, in self-defense."
"People V. Hecker (1895) 109 Cal. 451, 463-464, 42 p. 307).

A careful reading of CALJIC Nos. 5.30, 5.50, 5.51, 5.52 and
5.55 might lead to that conclusion were it not specifically and
explicitly rejected by CALJIC No. 5.56, which sets out a clear
and quite different test.

## CONCLUSION

For all the forgoing reasons, petitioner submits his objec-
tions to the Magistrate's Findings and Recommendations should
be sustained.

Respectfully Submitted,

Dated: December 14, 2011

Houa Lao
Petitioner Pro Se

11

**PROOF OF SERVICE**

**(C.C.P. §2015.5; 28 U.S.C. §1745)**

I, Houa Lao, am over the age of eighteen (18) years, and I
am a party to the within cause of action.  My address is:

> Houa Lao F-08644
> C.S.P.-SACRAMENTO
> P.O. Box 290066
> Represa, CA 95671

On, December 14, 2011, I served the following documents:

**Objections to Magistrate Judge's Findings And Recommendations** on
the below named individuals by depositing true and correct copies
thereof in the United State mail in Represa, California, with
postage fully prepaid thereon, addressed as follows:

> United States District Court
> Eastern District of California
> Office of the Clerk
> 501 I St., Suite 4-200
> Sacramento, CA 95814-2322

I have read the above statements and declare under the penalty
of perjury of the laws of the State of California that the foregoing
is true and correct.

Executed the 14th day of December 2011, at California State Prison
at Sacramento, Represa, California.

(Signature)
Declarant

# **EXHIBIT COVER PAGE**



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:_____/_____pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

```
 1   A.    No, I didn't know.
 2   Q.    Well, did you tell Detective Pat Keller on February
 3   15th, 2002, at 10:55, "I am RBG slash HNS, and Houa Lao is
 4   MOD"?
 5   A.    No, I didn't say that.
 6   Q.    Okay.  Did you also tell him that you knew Houa Lao
 7   from Rio Linda High School?
 8   A.    Yeah.
 9   Q.    So he is somebody you knew?
10   A.    Yeah.  Yeah, I know him.
11   Q.    How do you know him?
12   A.    Going to school, see him around.  That's it.
13   Q.    Have problems with him?
14   A.    No.
15   Q.    Did you like him?
16   A.    We just didn't talk to each other.
17   Q.    One more time?
18   A.    We just didn't talk to each other, but we see each
19   other around school.  That's it.
20   Q.    You were interviewed again on June 4th, 2002, at
21   4:10 at Rio Cosumnes Correctional Center in Elk Grove,
22   correct?
23   A.    Yes.
24   Q.    And at that point the DA investigator and a
25   person -- DA named Ernest Sawtelle came and spoke to you,
26   correct?
27   A.    I forgot the name.
28   Q.    Well, two people came and talked to you, right?
```

# **EXHIBIT COVER PAGE**



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit: _____ pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

```
 1   DET. KELLER:   Uh-huh.

 2   HOUA LAO:      Think.  I don't know.

 3   DET. KELLER:   How do you explain that?  Is mom lying?

 4   HOUA LAO:      Huh?

 5   DET. KELLER:   Is your mom lying to me?

 6   HOUA LAO:      No, she's not lying.

 7   DET. KELLER:   Well, then why did you say you were home

 8                  tonight?

 9   HOUA LAO:      I told you I just got home from Fresno this

10                  morning, today.

11   DET. KELLER:   Last night?

12   HOUA LAO:      That's why --

13   DET. KELLER:   Well, she said you haven't been there today.

14   HOUA LAO:      Well, I was.  I dropped off the car and then

15                  they picked me up.

16   DET. KELLER:   So you didn't go in the house?

17   HOUA LAO:      No, no, no.

18   DET. KELLER:   No?  You just dropped off the car and left?

19   HOUA LAO:      Yeah, that's what I say.

20   DET. KELLER:   That's pretty convenient.

21   HOUA LAO:      That's what I say to you.  That's what I --

22   DET. KELLER:   What about the shotgun shells that are in

23                  your bedroom?

24   HOUA LAO:      Huh?  Those?  The shotgun -- those shells

25                  belong to my, um -- my dad shotgun.
```

. 0758

(46)          ANCHOR REPORTING SERVICE

```
 1   DET. KELLER:   To who?

 2   HOUA LAO:      My -- my dad shotgun.

 3   DET. KELLER:   Your dad's what?

 4   HOUA LAO:      Shotgun.

 5   DET. KELLER:   Shotgun?

 6   HOUA LAO:      Yeah.  He for um, he's hunting.

 7   DET. KELLER:   Where's your dad live?

 8   HOUA LAO:      Huh?  He live down the street from my house.

 9   DET. KELLER:   What's his address?

10   HOUA LAO:      I don't know.  It's down a little bit.

11   DET. KELLER:   How far?

12   HOUA LAO:      Oh, half mile.

13   DET. KELLER:   Where at?  What street does he live on?

14   HOUA LAO:      Oh, I think it was South.

15   DET. KELLER:   South Avenue?  South and what?

16   HOUA LAO:      Something   I   think,   South   and   Morey

17                  (Phonetic).

18   DET. KELLER:   South and Morey?

19   HOUA LAO:      Yeah.

20   DET. KELLER:   What's the house look like?

21   HOUA LAO:      Uh, he live in the apartments.

22   DET. KELLER:   Apartments?

23   HOUA LAO:      Uh-huh.

24   DET. KELLER:   What number?

25   HOUA LAO:      I don't know.
```

0759

(47)        ANCHOR REPORTING SERVICE

# EXHIBIT COVER PAGE

$C$

**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:___/___pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ✓ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |
| ☐ | |

```
 1                        bad position whether you shot or not.  And if
 2                        somebody was shooting at you guys which,
 3                        obviously, somebody shot at that car, and you
 4                        guys shot back to protect yourselves or
 5                        whatever then you need to explain that to me
 6                        now.
 7   HOUA LAO:     Uh-huh.
 8   DET. KELLER:  Because this is -- this is it.  You're going
 9                        to wind up getting charged with a murder.
10   HOUA LAO:     But I didn't know for real.  Telling you the
11                        truth, I didn't know.  Because when I got in
12                        the car it was already looked like that.
13                        Probably it already happened before they come
14                        to pick me up, so --
15   DET. KELLER:  That's not true, okay?
16   HOUA LAO:     I don't know 'cause that's all I know --
17   DET. KELLER:  They tell you about being involved in a
18                        shooting?
19   HOUA LAO:     Huh-uh.
20   DET. KELLER:  What -- what parts of the car did you touch
21                        when we fingerprinted?  Where am I going to
22                        find your fingerprints?
23   HOUA LAO:     Huh?  What part?  (Unintelligible) car, door.
24   DET. KELLER:  Which door?
25   HOUA LAO:     The passenger.
```

0766

(54)          ANCHOR REPORTING SERVICE

# **EXHIBIT COVER PAGE**



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit: _____2_____ pages.

JURISDICTION: ( Check only one)

☐     Municipal Court

☐     Superior Court

☐     Appellate Court

☐     State Supreme Court

☑     United States District Court

☐     State Circuit Court

☐     United States Suprme Court

☐     Grand jury

1    he was in the wrong territory, correct?

2    A      That could happen.

3    Q      Now, you said that most of the MOD members live in

4    the south area?

5    A      Yes.  The majority of them do.

6           Some live in the north areas.  There's very few that

7    reside in the north area.

8    Q      'Cause if you live in the north area, you're either

9    not affiliated, definitely not -- or usually not affiliated

10   with MOD or affiliated with HNS?

11   A      Yes.

12   Q      You talked -- you spoke about several people that

13   were involved in this case which you're familiar about --

14   with, and you indicated in getting a little background with

15   the history that an older relative of Vue Heu was killed?

16   A      Vue Heu?

17   Q      Vue Heu.

18   A      Yes.

19   Q      Excuse me.  Have you validated him or do you know

20   whether he is a member of a gang?

21   A      Vue Heu or his relative?

22   Q      Vue Heu.

23   A      No.

24   Q      Heu is a member or Heu was involved with this case?

25   He was witness in this case?

26   A      He is definitely an associate of HNS.

27   Q      Now, prior to February of '02, had you heard Houa

28   Lao's name at all in your intelligence gathering?

1    A       No.

2    Q       Was his name listed in any of the reports that you

3    had reviewed?

4    A       No.

5    Q       So the first you became aware of Houa Lao was as a

6    result of this case; is that correct?

7    A       That's correct.

8    Q       Now, one of the things -- tell me if I am wrong on

9    this:  One of the things that one group would do to

10   irritate another group of rivalry, for lack of a better

11   word, is to go into the area and pick up on their girls; is

12   that a safe statement?

13   A       Yes.

14   Q       So if I am a -- well, I wouldn't work because I'm a

15   female, but, say, if Mr. McCormick were MOD and he wanted

16   to go in your face, HNS, he would go to an HNS area and

17   start picking up on the girls, and that is kind of a slap

18   in the face of the HNS guys, right?

19   A       Generally speaking or pertaining to this case?

20   Q       Generally speaking.

21   A       Sure.

22   Q       So that's not unusual, to go into a rivalry's

23   territory for a purpose other than committing a drive-by

24   shooting or an act of violence?

25   A       I don't know how often that occurs that you are

26   referring to as far as picking up girls.  Yeah, I'm sure it

27   has occurred.

28   Q       That is something that you have seen happen,

# EXHIBIT COVER PAGE



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:_____/_____pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

```
 1   Q      And that's true with the stolen handgun, that Kinston
 2   Her had -- Kinson -- I'm sorry -- that Kinson Her -- the
 3   stolen handgun that you testified on direct that Kinson Her
 4   admitted to having, you don't know specifically that that was
 5   for the benefit or at the direction of the M.O.D. gang; is
 6   that correct?
 7   A      No, I did not speak to Kinson.
 8   Q      Okay.  Now, in the letter that Mr. Lao wrote to his
 9   ex-girlfriend, he had he signed it M.O.D.; is that correct?
10   A      Yes.
11   Q      But he didn't actually say he was a member; he just
12   signed it M.O.D.; is that correct?
13   A      Yes.
14   Q      Okay.  And you indicated that it's your opinion that
15   this crime was -- the shooting in this case was for the
16   benefit or at the direction of M.O.D.  What are you basing
17   that on?
18   A      There's been a documented history between H.N.S. and
19   M.O.D. and it's well known that H.N.S. or H.N.S. associates
20   hang out at that address or on Western Avenue.  We've had
21   several shootings in that area within the last few months
22   between H.N.S. and M.O.D.  You know, with Kinson Her who is,
23   like I said, a validated Y.M.S. or M.O.D. gang member, he
24   basically has no reason to be in that area.
25          One of the things that the south area boys and the
26   north area boys do is they go to each other's territory to
27   pick up girls, but the other thing is they go there to not
28   only pick up the girls, but kind of rub it in the others'
```

# EXHIBIT COVER PAGE

$F$

**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:_____/_____pages.

JURISDICTION: ( Check only one)

| | Municipal Court |
| | Superior Court |
| | Appellate Court |
| | State Supreme Court |
| ✓ | United States District Court |
| | State Circuit Court |
| | United States Suprme Court |
| | Grand jury |

1   them aware of each other.  What's been going on?
2   A     Well, first of all, MOD, because they are considered
3   the biggest and baddest gang, they don't get along with
4   anyone else.  They don't get along with TRG, which is Tiny
5   Rascal Gang, not to be confused with TLR, Tiny Little
6   Rascals.  They don't get along with HNS.

7         And, of course, one of their other gangs in the area
8   is JCC.

9         But as far as the incidents that have occurred back
10  from the '90s, I mentioned the one in June 18th of '94,
11  were Andy Heu was standing in front of a residence along
12  with some of his other HNS gangsters.  A suspect vehicle
13  full of MOD gangsters roll up, start shooting into the
14  crowd, killing Andy Heu.  Andy Heu is either the older
15  brother or older relative of Vue Heu.  Vue Heu is one of
16  the witnesses from this current case we are on right now.

17        October 23rd, 1994:  You had the victim who was a
18  known TRG gang member.  He was waiting at a stoplight in
19  the south area, when a suspect van pulls up alongside of
20  him and opens fire into his vehicle, killing him.

21        Those suspects were later identified and arrested.
22  They were all MOD gang members.

23        January 19th, 1995:  Again, you had a TRG victim and
24  his friends.  They were actually gonna go and commit some
25  type of crime towards the suspects, either a drive-by
26  shooting or some type of beat down.  The suspects noticed
27  them driving up and down their street, grabbed a couple
28  handguns, and as the victims came out of their car, they

# **EXHIBIT COVER PAGE**

$G_7$

**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit: ___/___ pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

```
 1   A       No, that's not always true.  We have several people
 2   who live in the Strawberry Manor area that are not friendly
 3   with H.N.S., and they repeatedly have gotten beaten up or
 4   something violent has happened to them or to their homes
 5   throughout the years.  They just kind of tolerate each other.
 6   Who knows why they haven't killed each other yet.
 7   Q       Just because you see somebody standing in that area
 8   doesn't mean they're automatically going to be Hmong Nation
 9   Society; is that correct?
10   A       That is correct.
11   Q       Okay.  Now, is there a counterpart, is there a place
12   where the M.O.D. tend to congregate or hang out in
13   Sacramento?
14   A       There's a lot of M.O.D. that hang out at Susan B.
15   Anthony Park which is off of Detroit Boulevard.  And I can't
16   recall the other park.  It's off of Madison actually where a
17   lot of M.O.D. used to hang out at.  South area M.O.D. is a
18   little bit different where they don't really congregate on
19   the streets like the north area H.N.S. does.
20   Q       Okay.  So the way the M.O.D. group interacts with each
21   other is somewhat different than the way the Hmong Nation
22   Society interacts?
23   A       It has been, yes.
24   Q       Okay.  Now, every crime committed by a M.O.D. gang
25   member is not necessarily for the benefit or at the direction
26   of the M.O.D. gang; is that correct?
27   A       The M.O.D. gang or their leader or --
28   Q       Right.  Well, that's what we're ultimately talking
```

# EXHIBIT COVER PAGE



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:____/____pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ✓ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

```
 1   MR.XIONG:      (No audible response).

 2   DET.LEE:       But once you -- if you're MOD, you ain't

 3                  going out there, right?

 4   MR.XIONG:      No.

 5   DET.LEE:       Okay.  So you either gotta be cool -- you

 6                  have to be cool with HMS then.

 7   MR.XIONG:      Yep.

 8   DET.LEE:       Right?

 9   MR.XIONG:      Yep.

10   DET.LEE:       Okay.  This guy -- I -- I gotta make sure I

11                  understood that.  Are you -- are you HMS

12                  then?

13   MR.XIONG:      (No audible response).

14   DET.LEE:       But you're cool with HMS, though.

15   MR.XIONG:      Yeah.

16   DET.LEE:       Okay.  'Cause I know all you HMS Boys, or

17                  some of the HMS Boys were hanging out by the

18                  boat all the time all throughout the summer.

19                  We were out there all summer.

20   MR.XIONG:      The summer, I was locked up.

21   DET.LEE:       You were locked up in the summer?

22   MR.XIONG:      Yeah.

23   DET.LEE:       For what?

24   MR.XIONG:      Gun.

25   DET.LEE:       Okay.  Yeah.  But I know -- I know the other
```

# **EXHIBIT COVER PAGE**

$$\boxed{\mathcal{I}}$$

**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:_____/_____pages.

JURISDICTION: ( Check only one)

☐　　　　Municipal Court

☐　　　　Superior Court

☐　　　　Appellate Court

☐　　　　State Supreme Court

☑　　　　United States District Court

☐　　　　State Circuit Court

☐　　　　United States Suprme Court

☐　　　　Grand jury

| 1 | X | CRIME RPT SUPP | 4 | | MEMO |
|---|---|---|---|---|---|
| 2 | | INCIDENT RPT SUPP | 5 | | OTHER |
| 3 | | MOTOR VEH SUPP | | | |

**SACRAMENTO POLICE DEPARTMENT**
SUPPLEMENTARY INVESTIGATION REPORT

REPORT NUMBER
**02-10546**

| CRIME CODE SECTION |
|---|
| 187 PC |

*ORIGINAL*

VICTIM:  **Vue, Fong**

**Detective Follow-Up, Witness Statement:**        (Vang, May N., DOB 12/23/83)

On 02/04/02, at approx. 0230 hours, I spoke to May Vang at her home and obtained her statement. She said the following in summary:

The two boys that got shot do not live here. They are friends with people about one or two houses away, I do not know who those people are and I do not know the people who got shot. Everyone always hangs out by that mailbox out there. I have a younger brother who is 16 years old, but he left already after the police talked to him. I don't think he knew who the people were that got shot. My brother and my husband were playing video games at the time of the shots.

Friday night my sister-in-law called the police about some shooting that went on outside. I called police last night when shooting happened again. I was in the kitchen making dinner and I heard five gunshots, then I saw a black car go by that way (pointed north on Western Ave.). The gunshots I heard were from more than one gun I think because they sounded so different. It sounded like two shots from one gun and three shots from another gun. I called 911 when I heard the shots.

I went outside to see what happened and saw one person laying by the garage, by the boat trying to move. I saw that his face was all bloody and I was telling him just to breathe. There was someone with him holding his hand, but I don't know who that person was. There was another shot person behind the car (Suzuki), on the lawn, sitting on the ground. He had a tissue to his face and he was also bleeding. I don't know where he got the tissues from.

I don't think I'd recognize any of the people involved if I saw them again. My husband and father are here, my husband is Yaneng Her and my father is Chao Vang. I have two sisters, ages 15 and 13 who also live here. That is my furniture in the garage, it is being stored there temporarily until the house my husband and I are planning to move into is ready. That house is a few doors down, but I am worried about moving to this neighborhood now with all the things that have been going on around here.

| REPORTING OFFICER | | BADGE | DIV | DATE | APPROVED BY | |
|---|---|---|---|---|---|---|
| Fesmire | | 767 | 32 | 2/3/02 | | |
| ASSISTING OFFICER | | BADGE | DIV | TIME | BADGE | |
| | | | | 1145 | | |
| | | | | | Page | of |

# EXHIBIT COVER PAGE



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit: _2_ pages.

JURISDICTION: ( Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [✓] United States District Court
- [ ] State Circuit Court
- [ ] United States Suprme Court
- [ ] Grand jury



COUNTY OF SACRAMENTO
OFFICE OF THE
DISTRICT ATTORNEY
BUREAU OF INVESTIGATION

CASE NAME: LAO, HOUA _____ June 7, 2002

OFFENSE. PC 187 _____ AGENCY CASE NO· SPD 02-10546 _____

REQUEST BY: DDA ERNEST SAWTELLE   REPORT MADE BY: INV.MARK RALL ___

## SUMMARY OF FACTS:

On June 7, 2002 at 11:30 a.m., I contacted Vang Vang at ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There are two witnesses in this case that have
the same name of Vang Vang. Vang provided the following information in summary.

Vang lives at ▮▮▮▮▮▮▮▮▮▮ with his parents and siblings. He is a sixteen-year-
old student at Grant Community School. On the night of the shooting, Vang was visiting his
friend down the street. He identified his friend as having his same name of Vang Vang. He did
not know his friend's address but described the location as the house where the shooting
occurred. Shortly before the shooting, Vang had been watching a "Hmong" movie with his
friend (Vang Vang). Other people inside the house included his friend's parents and two sisters.

Vang walked into the kitchen to wash his hands at the sink. He observed a black car
driving southbound down Western Avenue. He was standing at the kitchen window, washing his
hands when he made this observation. Vang estimated that he heard gunfire about a minute later.
Vang described the gunfire as 2-3 shotgun blasts followed by 4-5 pistol rounds. Vang observed
the same black car driving northbound on Western Avenue at the same time he heard the gunfire.
Vang could not see the occupants of the black car. Vang heard no additional gunfire once the
black car left the area.

Vang immediately ran outside and observed two of his friends down on the ground and a
third friend crouched down nearby  He identified the friends that were on the ground as Fong
and Yee. Yee had a wound to his head. The friend that was crouched down on the ground was
Vue. Vang said the only other person that was present was Vang Vang, who followed him out of
the house. Vang said that nobody outside had guns.

Vang said that Yee told him that there were three people inside the black car  Yee said
nothing in regards to the incident being gang related. Vang added that he believes the people in

 42 2

the black car were MOD. Vang denied being a gang member  He added that Yee is a member of RBG, but that the other Vang Vang, Vue, and Fong do not "bang"

Note: Vang had a tattoo on his right forearm, which read "Hmong".  The letter "o" of the tattoo was designed to look like a bomb, similar to a cannonball with a fuse sticking out of the top.  Vang stated the tattoo was artwork to symbolize his ethnic origin.

**END OF STATEMENT**

# EXHIBIT COVER PAGE



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:___2___pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

```
 1  MR.XIONG:    Yeah.   They going down, and then they came
 2               and stopped.   And we was, like, right here.
 3  DET.LEE:     Okay.
 4  MR.XIONG:    Then -- then they start shooting.
 5  DET.LEE:     So you guys noticed the car that was stopped
 6               then?
 7  MR.XIONG:    (No audible response).
 8  DET.LEE:     You notice it was stopped at the -- by
 9               Danville then?
10  MR.XIONG:    I don't know.   No.   They going to Danville.
11  DET.LEE:     Oh, okay.   They were going to --
12  MR.XIONG:    Um --
13  DET.LEE:     -- Danville.   Okay.
14  MR.XIONG:    -- you know.
15  DET.LEE:     What -- what did they -- uh -- so you guys
16               were kicking it by the boat --
17  MR.XIONG:    Yeah.
18  DET.LEE:     -- out there?   Okay.   Who else was out there
19               besides you and Fong?
20  MR.XIONG:    I think it was me, Fong and Vue.
21  DET.LEE:     Vue what?
22  MR.XIONG:    I think it was four to -- uh -- five.   I
23               don't know.   I think Vue Hue.   Um -- yeah.
24               Vang Vang.   Vang Vang.
25  DET.LEE:     Vang Vang was out there, too?
```

(3)      Anchor Reporting Service

```
 1  MR.XIONG:     Vang Vang, too.  Not -- not the one that

 2                lives in the house.  The one who lives

 3                down --

 4  DET.LEE:      The one (Unintelligible) down the street.

 5  MR.XIONG:     Yeah.

 6  DET.LEE:      On Lecter.

 7  MR.XIONG:     I think he was there, too.  Because he went

 8                -- when I got shot, I was standing right

 9                there.  He was talking to me.

10  DET.LEE:      Okay.  So Vang Vang, Vue -- what's Vue's

11                last name?

12  MR.XIONG:     Hue.  Hue.  H.

13  DET.LEE:      H-u-e?

14  MR.XIONG:     Yeah.  E-u, you know.

15  DET.LEE:      Okay.  Who else?

16  MR.XIONG:     I don't even know.

17  DET.LEE:      Well, who do you remember seeing out there?

18  MR.XIONG:     When I got shot, I see --

19  DET.LEE:      No.  Before you got shot.

20  MR.XIONG:     -- before I got shot.  I don't even know.

21  DET.LEE:      And you guys were all gathered around the

22                boat, right?

23  MR.XIONG:     They -- we -- we went, like, right here

24                talking, you know?

25  DET.LEE:      You guys -- you guys were right here
```

# **EXHIBIT COVER PAGE**

**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:_____pages.

JURISDICTION: ( Check only one)

☐   Municipal Court

☐   Superior Court

☐   Appellate Court

☐   State Supreme Court

☑   United States District Court

☐   State Circuit Court

☐   United States Suprme Court

☐   Grand jury

```
 1  DET.LEE:      Revolver?

 2  MR.XIONG:     Third time.

 3  DET.LEE:      What was the third time?

 4  MR.XIONG:     A .380.

 5  DET.LEE:      A .380?

 6  MR.XIONG:     Yeah.

 7  DET.LEE:      Well, I'm waiting for that photo to show up

 8                here.  So one -- once we get the photo, then

 9                we'll be able to -- uh -- take you home

10                then.

11  MR.XIONG:     Yeah.

12  DET.LEE:      Okay.  I'll be right back.  I'm gonna see if

13                it's here.

14                     (DETECTIVE LEE LEAVES THE ROOM)

15  DET.LEE:      Yee.  Um -- let's talk about Houa.  Okay?

16                Hey, wake up, man.  Come on.  How long you

17                known Houa?

18  MR.XIONG:     I don't know him, though.  I only know him

19                'cause my enemies.

20  DET.LEE:      You just know him as enemies?

21  MR.XIONG:     Yeah.

22  DET.LEE:.     So you haven't -- have you known him for a

23                long time, or -- okay.  But you don't know

24                him like -- uh -- you know, like, "Hey,

25                what's up, homie?"  Nothing to --
```

| | | |
|---|---|---|
| 1 | | at all? |
| 2 | MR.XIONG: | No.  No guns. |
| 3 | DET.LEE: | All right.  You've had a gun before, though, |
| 4 | | right? |
| 5 | MR.XIONG: | Yeah. |
| 6 | DET.LEE: | Huh? |
| 7 | MR.XIONG: | Yeah.  Got caught with it.  (Laughter). |
| 8 | DET.LEE: | I mean, I'm sure you've had guns before and |
| 9 | | never been caught, right? |
| 10 | MR.XIONG: | No.  I got caught -- all my guns, I caught. |
| 11 | DET.LEE: | Huh?  Every time you've had a gun you've |
| 12 | | been caught? |
| 13 | MR.XIONG: | Yep.  (Yawning). |
| 14 | DET.LEE: | No. |
| 15 | MR.XIONG: | Yeah.  (Yawning.) |
| 16 | DET.LEE: | Come on, now. |
| 17 | MR.XIONG: | Got caught (Unintelligible) .380. |
| 18 | DET.LEE: | What's that? |
| 19 | MR.XIONG: | I said I got caught with a -- |
| 20 | DET.LEE: | You got caught with a .380 or a .38? |
| 21 | MR.XIONG: | A .38. |
| 22 | DET.LEE: | A .38? |
| 23 | MR.XIONG: | Two -- two times with .38. |
| 24 | DET.LEE: | Two times with the .38? |
| 25 | MR.XIONG: | Yeah. |

# EXHIBIT COVER PAGE



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit: _____3_____ pages.

JURISDICTION: ( Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ✓ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Suprme Court |
| ☐ | Grand jury |

1   JAN SCULLY
    District Attorney
2   Sacramento County
    901 G Street
3   Sacramento, CA 95814-1858
    Phone (916) 874-6637
4

5

6

7               **SUPERIOR COURT OF CALIFORNIA**

8                  **COUNTY OF SACRAMENTO**

9

10  THE PEOPLE OF THE STATE OF CALIFORNIA,        NO.  02F01534  DEPT.  10

11                              Plaintiff,        PEOPLE'S PROPOSED
                                                  WITNESS LIST
12                    vs.
                                                  Hearing:  July 12, 2005
13  Houa Lao                                      Time:   9:00 a.m.
    Kinson Her
14

15                           Defendants.

16                     **WITNESS LIST**

17

18

19      Civilian Witnesses

20      Yee Xiong                    Lyndsey Mariscal
        Rindy Her                    Blong Vang
        Melicia Vang                 Kanram Chand
21      Chia Cha                     Mahesh Chandra
        Michael Thao                 Julie Her
22      Souriyan Saleumsay           Alicia Garner
        Adam Hue                     Greg Natividad
23      Vue Hue                      Peter Filice (custodian of
        Vang Vang                    Records FOX 40)
24      Peter Lor                    Custodian of Records AT & T
        Laxu Cha                     Wireless
25      John Her                     Custodian of Records Sprint
        May Vang                     Custodian of Records Cingular
26      Pavel Fomin
        Xang Thao
27      Brenda Ly

                              (1)

## Witness Order

1. CSI Hamilton
2. Ms. Holloway- 911 tapes
3. Officer Burke
4. Officer Boyd
5. Officer Kirtlan
6. Officer Navarrete
7. Detective Marnie Stigerts
8. Vang Vang : 10.1. 85 ✓
9. Vue Heu
10. Adam Heu
11. Yee Xiong
12. May Vang
13. Angelica Garner
14. Chia Cha
15. Michael Thao ✓
16. Souriyan Saleumssay
17. CSI Williams
18. CSI Ciarnelli
19. CSI Sardelich
20. Detective Pat Keller
21. Officer W. Estrada
22. Sgt. Jim Duncan
23. Sgt Todd Sockman
24. CSI Liz Troxel
25. Officer M. Garner
26. Officer Johnson
27. CSI Garcia
28. Brenda Ly
29. Lyndsey Mariscal
• 30. Detective Pat Keller
31. Peter Filice- Fox 40.
32. Officer J. Saaria/
33. Officer Murrieta
34. Officer Sanchez
35. Pavel Fomin
36. Detective Toni Sall
37. CSI Modeste
38. Rindy Her
39. Xang Thao
40. Laxu Cha
41. John Her
42. MCI World Com
43. Sprint

44. Cingular
45. Melicia Vang
46. Julie Her - *CO D's sister*
47. Karam Chand
48. Mahesh Chandra
49. CSI Nou Khang
50. CSI Lee Willis
51. CSI Anthony Schiele
52. CSI Woo
53. Faye Springer
54. DNA
55. Coroner
56. Treatment Xiong Yee
57. Officer Cheryl Schmidt
58. Detective Chris Tayson -*MN.*
59. Detective Jim Kang
60. Detective Aaron Lee

# EXHIBIT COVER PAGE



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit:_____|_____pages.

JURISDICTION: ( Check only one)

|  | Municipal Court |
|---|---|
|  | Superior Court |
|  | Appellate Court |
|  | State Supreme Court |
| ✓ | United States District Court |
|  | State Circuit Court |
|  | United States Suprme Court |
|  | Grand jury |

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

| | | | | | |
|---|---|---|---|---|---|
| DATE/TIME | : | JULY 29. 2005   9:00 A.M. | DEPT. NO | : | 10 |
| JUDGE | : | GRETA FALL | CLERK | : | BARBARA WILSON |
| REPORTER | : | NCR | BAILIFF | : | S. BURSIAGA |

PRESENT:

THE PEOPLE OF THE STATE OF CALIFORNIA,        Kevin McCormick, Deputy
            Plaintiff,                                              D.A..

VS.       Case No.:   02F01534                     Amy Rogers, Assist. P.D. and
                                                              Paul Irish, CAC

HOUA LAO and KINSON HER,
            Defendant.

Nature of Proceedings:   CT 1 187(a) PC, 12022.7 PC
                        12022.53(b)(c)(d)&(e)(1): CT 2·664/187(a) PC,
                        12022.53(b)(c)&(e)(1) PC: CT 3 12034(d) PC,
                        12022.53(b)((c)(d)&(e)(1) PC: 186.22(b)(1) PC:
                        ORDER TO PRODUCE IN-CUSTODY WITNESS

GOOD CAUSE APPEARING,

It is ordered that the Sacramento Sheriffs Department deliver the following
in-custody witness to testify in the above entitled proceedings on Monday,
August 1, 2005, at 1:30 p.m. in Department 10.

Witness: **Vang Vang, X-ref #3681772 DOB: 10-1-85.**  This witness is
currently housed at the Rio Cosumnes Correctional Center.

Dated:   July 29, 2005

                                            Greta Fall
                                            Hon. Greta Fall
                                            Judge of the Superior Court

| | | |
|---|---|---|
| BOOK | : | 10 |
| PAGE | : | |
| DATE | : | JULY 29. 2005   9:00 A.M. |
| CASE NO. | : | 02F01534 |
| CASE TITLE | : | PEOPLE VS. LAO and HER |

Superior Court of California,
County of Sacramento   0177

BY:   BARBARA WILSON,
            Deputy Clerk

Page 1 of 1

21

# **EXHIBIT COVER PAGE**



**EXHIBIT**

Description of Exhibit:

Number of pages to this Exhibit: _24_ pages.

JURISDICTION: ( Check only one)

|   |   |
|---|---|
|   | Municipal Court |
|   | Superior Court |
|   | Appellate Court |
|   | State Supreme Court |
| ✓ | United States District Court |
|   | State Circuit Court |
|   | United States Suprme Court |
|   | Grand jury |

# TABLE OF CONTENTS

PETITION FOR REVIEW     1

QUESTIONS PRESENTED     1

STATEMENT OF FACTS     2

ARGUMENT FOR REVIEW     4

### I.
**PETITION FOR REVIEW SHOULD BE GRANTED TO DETERMINE THE SCOPE AND LIMITS OF CALJIC No. 5.55 IN GANG CASES**

     4

### II.
**PETITION FOR REVIEW SHOULD BE GRANTED IN ORDER TO CLARIFY THE LAW OF IMPERFECT SELF-DEFENSE AS STATED IN THE 1997 REVISION OF CALJIC No. 5.17**

     10

### III.
**PETITION FOR REVIEW SHOULD BE GRANTED TO REASSESS THE CONSTITUTIONALITY OF CONSCIOUSNESS OF GUILT INSTRUCTIONS AIMED AT DEFENDANT ALONE**

     16

CONCLUSION     19

CERTIFICATION OF WORD-COUNT     20

## TABLE OF AUTHORITIES

**Cases**

*Crane* v. *Kentucky* (1986) 476 U.S. 683 — 9

*Delaney* v. *Superior Court* (1990) 50 Cal.3rd 785 — 16

*In re Christian S.* (1994) 7 Cal.4th 768 — 11,13

*In re Murchison* (1955) 349 U.S. 133 — 19

*Irvin* v. *Dowd* (1961) 366 U.S. 717 — 19

*Johnson* v. *State* (Nev.1976) 551 P.2nd 241 — 5

*Marshall* v. *Jerrico, Inc.* (1980) 446 U.S. 238 — 19

*Mullaney* v. *Wilbur* (1975) 421 U.S. 684 — 16

*People* v. *Adrian* (1982) 135 Cal.App.3rd 335 — 16

*People* v. *Bottger* (1983) 142 Cal.App.3rd 974 — 12

*People* v. *Boyette* (2002) 29 Cal.4th 381 — 11,12

*People* v. *Button* (1895) 106 Cal. 628 — 4

*People* v. *Cash* (2002) 28 Cal.4th 703 — 16

*People* v. *Ceballos* (1974) 12 Cal.3rd 470 — 4

*People* v. *Conckling* (1896) 111 Cal. 616 — 6,7

*People* v. *Crandell* (1988) 46 Cal.3rd 833 — 18

People v. *Crew* (2003) 31 Cal.4th 822 — 18

*People* v. *Ganier* (1950) 95 Cal.App.2nd 489 — 5

*People* v. *Graham* (1969) 71 Cal.2nd 303 — 11

*People* v. *Hinshaw* (1924) 194 Cal. 1 — 5

*People* v. *Holloway* (2004) 33 Cal.4th 96, 142      18

*People* v. *Jackson* (1996) 13 Cal.4th 1164      18

*People* v. *Jones* (1961) 191 Cal.App.2nd 478      4

*People* v. *King* (1978) 22 Cal.3rd 12      4

*People* v. *Loustenau* (1986) 181 Cal.App.3rd 163      14

*People* v. *Maurer* (1995) 32 Cal.App.4th 1121      12

*People* v. *Minifie* (1996) 13 Cal.4th 1055      7

*People* v. *Moon* (2005) 37 Cal.4th 1      11

*People* v. *Olguin* (1994) 31 Cal.App.4th 1355      6

*People* v. *Perez* (1979) 23 Cal.3rd 545      11

*People* v. *San Nicolas* (2004) 34 al.4th 614      18

*People* v. *Silva* (Colo.App.1999) 987 P.2nd 909      5

*People* v. *Williams* (1977) 75 Cal.App.3rd 731      7

*People* v. *Yeoman* (2003) 31 Cal.4th 93      18

*Peters* v. *Kiff* (1972) 407 U.S. 493, 501      19

*Smith* v. *State* (Tex.Crim.App.1998) 965 S.W.2nd 509      5

*State* v. *Wright* (Or.App. 1977) 572 P.2nd 667      18

*Tennessee* v. *Garner* (1985) 471 U.S. 1      14

*Turner* v. *Louisiana* (1965) 379 U.S. 466      19

**Statutes**

Pen. Code, § 197      4

**Other Authorities**

CALCRIM No. 571                                         14

CALCRIM No. 3472                                        5

CALJIC No. 2.03                                         16

CALJIC No. 2.06                                         17

CALJIC No. 2.51                                         17

CALJIC No. 2.52                                         17

CALJIC No. 5.17                                         2,10

CALJIC No. 5.55                                         2,4

CALJIC No. 8.40                                         16

CALJIC No. 8.50                                         16

Mark D. Greenberg
SBN: 99726
Attorney at Law
484 Lake Park Avenue, No. 429
Oakland, CA  94610

Attorney for Appellant

By Appointment of the Court of Appeal
Under CCAP's Independent Case System


## IN THE SUPREMECOURT OF THE STATE OF CALIFORNIA


| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | |
| ) | |
| **Plaintiff and Respondent,** ) | **C051473** |
| ) | |
| **KISON HER**, *et al.*, ) | **Sacramento No.** |
| ) | **02F06418** |
| **Defendants and Appellants.** ) | |
| ) | |
| _____ ) | |


### PETITION FOR REVIEW
### (LAO)

Appellant Lao respectfully requests review of the decision of the California Court of Appeal, Third Appellate District, filed on November 30, 2007, affirming his conviction for first-degree murder. A copy of the Court of Appeal decision is attached as an appendix hereto.

### QUESTIONS PRESENTED

1. In a gang case in which the prosecution's theory was that of a "drive-by shooting," and in which there was evidence of firing from the alleged victim's

1

side, is it error to instruct in accord with CALJIC No. 5.55 on pretextual self-defense when there was no evidence of an intent to provoke the other side, but where the case had to be resolved either as murder or as perfect or imperfect self-defense; and if the giving of CALJIC No. 5.55 was error, did it deprive appellant of his Sixth and Fourteenth Amendment right to a meaningful opportunity to present a defense?

2. Is the 1997 revision of CALJIC No. 5.17, informing the jurors that imperfect self-defense is unavailable "if the defendant by his unlawful or wrongful conduct created the circumstances which legally justif[ied] his adversary's use of force" an incorrect statement of law, which has now been corrected by CALCRIM 571, which omits this proviso, and did the giving of this erroneous instruction deprive appellant of his Sixth and Fourteenth Amendment right to a meaningful opportunity to present a defense?

3. Do consciousness of guilt and inference of guilt instructions aimed at the defendant alone violate due process?

## STATEMENT OF FACTS

For the most part, the statement of facts as set forth in the attached Court of Appeal decision is adequate. (Slip. Op., pp. 2-7.) However, a full understanding of the issues raised requires certain evidence not mentioned by the Court of Appeal be highlighted.

In its summary, the Court of Appeal noted the following:

" . . . . The rear window of the Camry was shattered by a bullet that he People's forensic expert determined was likely fired from outside the vehicle and which exited through the front windshield." (Slip op., p. 3.)

2

This, of course, is consistent with the alleged victims firing back, more or less in self-defense, after the Toyota had passed, having fired its aggressive barrage. But there was other evidence and other inferences.

The prosecution could not conclusively prove that the shots at the Camry came from behind. The rear passenger window, which was the side facing the alleged victims, was also shattered and, according to the prosecution's expert, it was shattered from the outside. There was no bullet found lodged in the car that corresponded to the shot that shattered this window. Further, the driver side windows of this car were rolled up and were in tact. The only possible exit was the rear windshield, in which case, it was possible that the expert's opinion of an exterior entry to shatter the rear windshield was wrong. In this regard, the prosecution's expert admitted that her assessment was highly circumstantial based on less than all that remained of the car by the time it was recovered. (2RT 565; 3RT 839-843, 863-863.)

The shattered passenger window, the in tact driver's side windows, and the absence of any fired slug in the interior compartment of the Toyota required a shot fired at the car from the north, i.e., as it drove up the street *toward* 3212 Western, where the alleged victims were standing. This scenario was consistent with the outside party having fired first. Further, the police did not search the opposite side of Western generally to look for bullets. They also failed to search the backyards of the houses on that side of Western to look for weapons, and did not search inside 3212 itself. (1RT 59-61, 63, 124, 125-126; 2RT 356.)

In addition, there was sufficient time between the shooting and the arrival of the police officer to allow any number of the multitude that gathered or that was there already to pick up any spent casings, such as those from the .40 caliber gun that was fired, or from the .38, or more from the .45, or even those from the possible 9 mm. (1RT 69, 71.) Finally, although there was no dispute, based on the circumstantial evidence, that the alleged victims actually fired, whether aggressively or defensively, both Yee Xiong and Veu Heu denied that their side

3

had fired at all. (1RT 203-204; 2RT 327-328; 4RT 1017, 1083-1084.) In sum there was evidence from which a trier of fact could conclude that the gang members on the street fired first.

### ARGUMENT FOR REVIEW

#### I.
#### PETITION FOR REVIEW SHOULD BE GRANTED TO DETERMINE THE SCOPE AND LIMITS OF CALJIC No. 5.55 IN GANG CASES

In accord with CALJIC No. 5.55, the jury was instructed that "[t]he right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." (4RT 1134.) The instruction was deemed sufficiently important by defense counsel that they objected to it for lack of support in the evidence. (4RT 1096.) It was sufficiently important to the prosecution that, based expressly on this instruction, he argued to the jurors that this instruction precluded any claim of self-defense in this case. (4RT 1172-1173.) Defense counsel were correct; the instruction was without evidentiary support; it does not apply merely because the defendants, knowingly, place themselves in a volatile situation in which they or their opponent are the potential aggressor; it applies only when there is evidence of an *intent* to create the appearance of, or pretext for, self-defense.

Section 197 of the Penal Code sets forth the grounds for justifiable homicide in this State, including self-defense, which has been codified in the statute in its common-law form. (*People* v. *Jones* (1961) 191 Cal.App.2nd 478, 481; see also *People* v. *King* (1978) 22 Cal.3rd 12, 26; *People* v. *Ceballos* (1974) 12 Cal.3rd 470, 478; and *People* v. *Button* (1895) 106 Cal. 628, 631.)[1] The

---

[1] Section 197 provides in relevant part: "Homicide is also justifiable when committed by any person in any of the following cases: [¶] (1) When resisting any attempt to murder any person, or to commit a felony, o r to do some great bodily injury upon any person; or . . . [¶] (3) When committed in the lawful

4

principle that self-defense is precluded when the defendant provokes his victim applied at common-law only when the deceased made the first attack, and "the defendant did some act or used some words *intended to and calculated to* bring on the difficulty *in order* to have a pretext for inflicting injury upon the deceased." (*Smith* v. *State* (Tex.Crim.App.1998) 965 S.W.2nd 509, 513-514, emphasis added; *People* v. *Silva* (Colo.App.1999) 987 P.2nd 909, 914 ["In order to warrant the giving of this instruction, the prosecution has the burden of establishing that the defendant intended to harm the victim and that he or she intended the provocation to goad the victim into attacking him or her as pretext for injuring or killing the victim."]; see also *Johnson* v. *State* (Nev.1976) 551 P.2nd 241, 242.) As the principle was formulated in California cases before the advent of CALJIC, "self-defense is not available as a plea to a defendant who has sought a quarrel *with the design* to force a deadly issue and thus, through his *fraud, contrivance, or fault, to create a real or apparent necessity for making a felonious assault.*" (*People* v. *Hinshaw* (1924) 194 Cal. 1, 26; *People* v. *Ganier* (1950) 95 Cal.App.2nd 489, 496.) And finally, as the principle has been formulated in this post-CALJIC era, "A person does not have the right to self-defense if he or she provokes a fight or quarrel *with the intent to create* an excuse to use force." (CALCRIM No. 3472.)

There is little doubt that the preclusion of self-defense under the principle of CALJIC No. 5.55 requires that the defendant intend to contrive and manipulate an occasion for the exercise of self-defense. Thus, for example, if there were in this case, evidence of an express plan to provoke first fire from HNS, or perhaps evidence of a conscious brandishing of weapons to provoke first fire, then the

---

defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed . . . ."

instruction would be justified. But the evidence does not show anything of the sort. Indeed, the prosecution's theory of a drive by shooting indicates an intent to *ambush*, not an intent that involves giving one's opponent an opportunity to defend himself. From the defense point of view, there was neither a driveby nor an intent to manipulate the appearance of self-defense. Rather, the issue presented by the evidence in this case was stark: appellant was either guilty of first degree murder for a driveby shooting, or he was not guilty of murder because of justifiable homicide. In short, the only question presented in this case was *which* party *initiated* the deadly affray. (*People* v. *Conckling* (1896) 111 Cal. 616, 622.) CALJIC No. 5.55 was completely without evidentiary support.

But what of the prosecutor's interpretation of the instruction, which he gave in closing argument as follows?:

"But there is an instruction, one of them you received, and it has to do with self-defense. If you're a gang member, okay, and your decision is to have that kind of weaponry, go into that area, run up on your rivals, possessing firearms, to initiate some sort of quarrel or a fight, you're not entitled to self-defense, okay?

"This is what the instruction says:

"The right of self-defense is not available. The right of self-defense does not exist to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense. It does not exist.

"Okay. That instruction would eliminate any possibility of self-defense. . . ." (4RT 1172-1173.)

This is simply *not* the law. In *People* v. *Olguin* (1994) 31 Cal.App.4th 1355, the defendant killed his opponent from a rival gang where mutual provocation and gangster punctilio was the order of the day and "the expected

6

prelude for violent confrontation." (*Id.*, at pp. 1366-1367.) The Court agreed that this was not the type of factual predicate necessary to warrant instruction in accord with CALJIC No. 5.55, but found the error harmless in any event. (*Id.*, at p. 1380.) But it is clear that the factual predicate for the instruction was missing in *Olguin* because there was no evidence of an *intent* to create a pretext for the exercise of self-defense. The gang milieu of the confrontation makes no difference, since the law does not determine the right to self-defense by the broad moral context in which a dispute arises. It depends from the very narrow question of who, by an overt physical act that could be reasonably interpreted as dangerous to the other person's life or limb, initiated the fatal encounter. (*People* v. *Conckling, supra*, 111 Cal. 616, 622; *People* v. *Williams* (1977) 75 Cal.App.3rd 731, 739-740; see *People* v. *Minifie* (1996) 13 Cal.4th 1055, 1068 ["[T]he law recognizes the justification of self-defense not because the victim 'deserved' what he or she got, but because the defendant acted *reasonably* under the circumstances."].)

The situation presented here, and often in many gang cases, is no different than that addressed by this Court in *People* v. *Conkling* (1896) 111 Cal. 616. In *Conkling*, the deceased rented a piece of property over which passed a road customarily used by the neighboring residents for travel. He fenced off the road to prevent travel, which caused eventually a heated confrontation between him and defendant in which threats were exchanged. Defendant retreated, retracing his steps in order to complete his journey. However, a day or two later, defendant bought a rifle, after which he went and tore down the fence. Another two days later, defendant was proceeding down the road in his buggy, armed with his rifle when he encountered the deceased. Trouble arose between them, and defendant shot and killed the deceased with his rifle. There were no eyewitnesses to the confrontation. (*Id.*, at pp. 619-620.)

This Court in *Conkling* made it clear that the question here was not who had the legal or moral right to the passage over the road, but who in fact "began

7

the deadly affray – that is, who by some overt act, caused the other, as a
reasonable man, to believe that he was in great danger of loss of life or limb . . . ."
(*Id.*, at pp. 621-622.) From this it followed that the following instruction was
erroneous:

> " '[W]hile it is true that an honest apprehension of danger to life or
> limb may justify a man or taking the life of another, yet that
> apprehension must arise out of a reasonable cause. But a cause
> which originates in the fault of the person himself in a quarrel which
> he has provoked, or in a danger which he has voluntarily brought
> upon himself by his own misconduct, cannot be considered
> reasonable, or sufficient in law to support a well-grounded
> apprehension of imminent danger to his person. Error of
> apprehension the law overlooks, when a man is called upon to act on
> appearances, but it does not overlook dishonesty of apprehension.
> Hence, a real or apparent necessity brought about by the design,
> contrivance, or fault of the defendant, cannot be availed of as a
> defense for the commission of a crime or a homicide.'" (*Id.*, at pp.
> 624-625.)

This Court commented:

> "We think this instruction was a trespass upon the rights of the
> defendant, as not containing a sound exposition of the law. There
> was no evidence in the case that the defendant was the first assailant,
> and then withdrew, or attempted in good faith to withdraw, from the
> affray before he fired the fatal shot. In fact, defendant's own
> testimony is to the contrary. For this reason the instruction,
> regardless of the soundness of the law covered by it, would seem to
> be without the facts,, and not pertinent to the issues under
> investigation." (*Id.*, at p. 625.)

Thus, *Conkling* makes it crystal clear that a defendant may have enmities
with the deceased, may arm himself, may place himself in a situation in which
violence was a possibility, and may still act in self-defense and be vindicated in

8

court *without* the burden of an instruction on contrived self-defense. The reason is that either the defendant initiated the *deadly* affray or he did not. *Conkling* also makes it clear that being armed, at enmity with the deceased, and arguing over territorial rights does not warrant the instruction on contrived self-defense.

The Court of Appeal rejected the claim, making a feint in the direction of invited error: "[T]he instruction was simply part of a packet of self-defense instructions requested by the defense, all of which the Court decided to give and some of which conflicted with others." (Slip op., p. 22.) The Court did not follow through on this because the record clearly shows that defense counsel objected vehemently to the instruction in question. (4RT 1096.) Instead, the Court made the point that the jurors were told not to apply the instructions that had no factual predicate. (Slip op., pp. 22-23.) However, the assumption of an ability to do so takes no account whatsoever of the prosecutor's *express* misuse of the instruction in his closing argument quoted above.

The Court then goes on to deny that there was any substantial evidence to support a finding of self-defense, and therefore nothing with the improper instruction to conflict with. (Slip op., p. 23.) This, however, simply ignores the circumstantial evidence of the gunshots fired at the Camry from a direction in front of it, as well as the false denials of any shooting by the HMS witnesses, which can be construed as consciousness of *their* guilt.

Finally, the error here transcends state instructional error. Self-defense was the express defense presented by appellant. The giving of CALJIC No. 5.55, containing a principle that, according to the prosecutor, completely disqualified self-defense, effectively deprived appellant of his Sixth and Fourteenth Amendment rights to present a defense. (*Crane* v. *Kentucky* (1986) 476 U.S. 683, 689-690.)

The problem of self-defense and imperfect self-defense in gang cases presents an important issue of law. Under our current law, no one forfeits the right to self-defense merely by placing him- or herself in a violent or provocative

9

situation. It is still important who is the initial aggressor. If the law of self-defense needs to be modified under modern urban conditions in which gang crimes are frequent, then this must be addressed expressly, and the question raised by CALJIC No. 5.55 in the context of this case is an appropriate vehicle for doing so. Petition for review should be granted.

## II.
## PETITION FOR REVIEW SHOULD BE GRANTED IN ORDER TO CLARIFY THE LAW OF IMPERFECT SELF-DEFENSE AS STATED IN THE 1997 REVISION OF CALJIC No. 5.17

If there was reasonable doubt as to which side fired first, the gang milieu of the confrontation might lead one to infer a sort of "fog of war," in which it simply was not clear who started the violence or whether only one side started it or whether there was a simultaneous, semi-mutual impulse. Thus, the belief in the need for self-defense may have been unreasonable, raising a question of imperfect self-defense– a matter for which the trial court instructed the jurors in accord with CALJIC No. 5.17 as follows:

> "A person who kills another person in the actual unreasonable belief in the necessity to defense against imminent peril to life or great bodily injury kills unlawfully but does not harbor malice a forethought and is not guilty of murder. This would be so even though a reasonable person knowing the same facts, would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter." (4RT 1132.)

This is a precise statement of the doctrine of imperfect self-defense, but the following portion of the CALJIC instruction given in this case is not part of the doctrine and is an erroneous statement of law:

10

"However, this principle [i.e., imperfect self-defense] is not available and malice aforethought is not negated if the Defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack or pursuit." (4RT 1133.)

Below, appellant contended that this paragraph incorrectly stated the law, informing the jurors that a mistake of fact as to who the aggressor was disqualified the partial defense of imperfect self-defense, even though this Court has made it clear that imperfect self-defense is in fact a sort of mistake of fact of this nature. (*In re Christian S.* (1994) 7 Cal.4th 768, 779, fn. 3.) But before this contention is elaborated, it will be useful to address the Court of Appeal's claim of invited error since defense counsel requested CALJIC No. 5.17 without differentiating any specific part of it. (Slip op., p. 25.)

The doctrine of invited error is designed "to estop a party from asserting an error when his own conduct induces the commission of error." (*People* v. *Perez* (1979) 23 Cal.3rd 545, 549-550, fn. 3 (internal quotation marks omitted).) In the context of jury instructions, the doctrine is limited in its application because error is nonetheless error and is no less operative on deliberations of the jury because the erroneous instruction may have been requested by counsel for the defense." (*People* v. *Graham* (1969) 71 Cal.2nd 303, 319 (internal quotation marks omitted).) Moreover, because the liberty of the defendant in a criminal case is at stake in trial, there is a "continuing duty upon the part of the trial court to see that he jury [is] properly instructed upon all matters pertinent to [its] discussion of the cause." (*Ibid.* (internal quotation marks omitted).) Thus, there is limitation on estoppel by invited error: "The invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." (*People* v. *Moon* (2005) 37 Cal.4th 1, 28; *People* v. *Boyette* (2002) 29 Cal.4th 381, 438; *People* v. *Graham, supra,* 71 Cal.2nd at p. 319.)

11

Here, the record probably does "suggest" that defense counsel requested CALJIC No. 5.17, although this is not made expressly clear. It is based simply on the trial court's passing remark that "[t]he defense has requested the entire group of self-defense instructions" so that the court, over the objections of defense counsel, would also add CALJIC No. 5.55 to the mix. (4RT 1097.) But it is not enough for the record to show that appellant requested CALJIC No. 5.17, respondent must point to something on the record that exhibits a *tactical* reason for counsel to desire instruction on a principle that *limits* and potentially *removes* from the jury's consideration the very principle of imperfect self-defense counsel wants presented the jurors. The answer is that the third paragraph of CALJIC No. 5.17 was so unequivocally detrimental to appellant's interests that the record here does not establish invited error

Thus, in *People* v. *Boyette* (2002) 29 Cal.4th 381, the California Supreme Court rejected a claim of invited error where defense counsel himself requested consciousness of guilt instructions, which of course focus only on the defendant. The Court stated that although normally a request for an instruction would constitute invited error, precluding a challenge of these instructions on appeal, "we agree with defendant that the record demonstrates no obvious tactical reason why defense counsel wish to have the jury instructed that evidence that defendant gave willfully false or misleading statements could be used to infer a consciousness of guilt." (*Id.* at 438.) Similarly, in *People* v. *Maurer* (1995) 32 Cal.App.4th 1121, this Court declined to find invited error of an instruction that effectively allowed the prosecution to dispense with proving the requisite mental state of the crime. (*Id.*, at p. 1128.) Thus, too, in *People* v. *Bottger* (1983) 142 Cal.App.3rd 974, the Court refused to find invited error in counsel's having requested instruction on implied malice for a crime that requires an actual intent to kill, thereby lightening the prosecution's actual burden of proof. (*Id.*, at pp. 978-980.) As these cases illustrate, invited error is not established when the instruction requested is clearly detrimental to the defendant's interests, as in fact the limitation paragraph of

12

CALJIC No. 5.17 was in this case. In short, the request for instruction on imperfect self-defense does not "invite" with it an incorrect statement of law that *limits* the application of imperfect self-defense, which limitation cannot *possibly* be construed in favor of the defense.

The Court of Appeal nonetheless addresses the merits of the issue and cites this Court's footnote 1 in *In re Chirstian S.*, *supra*. (Slip. Op., p. 25.) The language of footnote 1 is as follows:

> "It is well established that the ordinary self-defense doctrine – applicable when a defendant reasonably believes his safety is endangered – *may not be invoked by a defendant, who, through his own wrongful conduct (e.g., the initiation of physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.* [Citation.] It follows, *a fortiori*, that imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*Id.*, at p. 773, fn. 1, emphasis added.)

However, this language has to be understood in light of the language of footnote 3 on page 779, in which this Court noted that "a claim of imperfect self-defense . . . is based on a defendant's assertion that he lacked malice under penal Code 188 because he acted under an unreasonable *mistake of fact* – that is, the need to defend himself against imminent peril of death or great bodily harm." (Italics added.) The context of footnote 1, and the seemingly contradictory assertion in footnote 3, makes it clear that this Court here was speaking of the ignoring of, or ignorance of, the *law*, and not a mistake of *fact*, or ignorance of *facts*. The purpose of footnote 1 is to emphasize that the doctrine of imperfect self-defense, in its sphere of partial exculpation, does not have a scope any

13

broader than perfect self-defense  has in its sphere of complete
exculpation.  In other words, under the doctrine of imperfect self-defense,
the defendant may not mistakenly or willfully broaden the *legal* contours
of the doctrine of self-defense and still claim imperfect self-defense.  By
taking the language out its qualifying context, the CALJIC committee has
extinguished any distinction between mistake of fact and mistake of law,
and has erroneously conferred on the language an absolute cast that it
should not have.[2]

One should note that the CALCRIM committee has now corrected
CALJIC's mistake.  The CALCRIM instruction on imperfect self-defense,
CALCRIM No. 571, is as follows:

"A killing that would otherwise be murder is reduced to
voluntary manslaughter if the defendant killed a person because he
acted in imperfect self-defense.  If you conclude that defendant acted
in complete self-defense, his action was lawful and you must find
him not guilty of any crime.  The difference between complete self-
defense and imperfect self-defense depends on whether the
defendant's belief in the need to use deadly force was reasonable.
The defendant acted in imperfect self-defense of:

"1.  The defendant actually believed that he was in imminent
danger of being killed or suffering great bodily injury; AND

---

[2]  The examples used in the *Christian S.* footnote are significant when analyzed.
The "commission of a felony" simply precludes the right of self-defense
regardless of the defendant's state of mind.  (*People* v. *Loustenau* (1986) 181
Cal.App.3rd 163, 170.)  Similarly, a fleeing felon has forfeited his right to self-
defense regardless whether he perceives correctly or not that his pursuer is going
to apply deadly force.  (See *Tennessee* v. *Garner* (1985) 471 U.S. 1, 11-12.)  In
both instances any belief by the defendant that he retains a right to self-defense
will always be a mistake of law.  The "initiation of a physical assault" differs in
that it can sometimes be predicated on a mistake of law and sometimes on a
mistake of fact.  To be consonant with the other examples and with the overall
thrust of the footnote, "the initiation of physical assault" must be understood as a
reference to a mistake of law and not to a mistake of fact.

14

"2. The defendant actually believed that he immediate use of deadly force was necessary to defend against danger; BUT

"3. At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"If you find that [the victim] threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find that the defendant knew that [the victim] had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find that the defendant received a threat from someone else that he reasonably associated with [the victim], you may consider that threat in evaluating the defendant's beliefs.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

There is *nothing* in this instruction that is similar to the assertion that imperfect self-defense is unavailable "if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force or attack." (CALJIC No. 5.17.) The CALCRIM Committee has corrected the instruction to conform to the law.

Thus, the limiting language in CALJIC No. 5.17 is erroneous and creates a bar to a finding of voluntary manslaughter if appellant was found to have objectively been the aggressor regardless of his subjective statement of mind. Thus, also, if the gang evidence in this case were accepted to one degree or

15

another by the jurors as showing an aggression by MOD, this should not have precluded a finding of imperfect self-defense *except* for the erroneous language of CALJIC No. 5.17.

This instructional problem is also of federal constitutional significance. The Fourteenth Amendment requires that the prosecution, in a murder case, prove beyond a reasonable doubt the absence of those factors that reduce a murder to the crime of voluntary manslaughter. (*Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 698 , 704; *People* v. *Adrian* (1982) 135 Cal.App.3rd 335, 339; see also CALJIC No. 8.40 and CALJIC No. 8.50.) The instructional language at issue here, in virtually negating the doctrine of imperfect self-defense, lightens this burden of proof in violation of the Fourteenth Amendment. Further, the right to present a defense, as guaranteed by the Sixth and Fourteenth Amendments, includes the right to present a partial defense. (*People* v. *Cash* (2002) 28 Cal.4th 703, 727; *Delaney* v. *Superior Court* (1990) 50 Cal.3rd 785, 809.)

Thus, an important question of state law and of federal constitutional law is presented here on a record where these questions make a significant difference. Petition for review should be granted.

## III.
## PETITION FOR REVIEW SHOULD BE GRANTED TO REASSESS THE CONSTITUTIONALITY OF CONSCIOUSNESS OF GUILT INSTRUCTIONS AIMED AT DEFENDANT ALONE

The trial court gave standard consciousness of, and inference of guilt instructions in this case. First, in accord with CALJIC No. 2.03, the jurors were instructed as follows:

"If you find that before this trial a defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a

16

circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significant [*sic*], if any, are for you to decide." (4RT 1116-1117.)

Secondly, the Court instructed in accord with CALJIC No. 2.06 as follows:

"If you find that a defendant attempted to suppress evidence against himself in any manner, such as by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (4RT 1117.)

Thirdly, there was instruction on motive, in accord with CALJIC No. 2.52:

"Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish that the Defendant is guilty. Absence of motive may tend to show the Defendant is not guilty." (4RT 1121.)

Finally, the jurors were instructed on flight in accord with CALJIC No. 2.51:

"The flight of a person after the commission of a crime is not sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (4RT 1121.)

Appellant contended that these were argumentative, pinpoint instructions, that rendered the instant case fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment.

17

As noted below, appellant pointed out that this Court has approved of these instructions as constitutional and even as beneficial to the criminal defendant. (*People* v. *Coffman* (2004) 34 Cal.4th 1, 103; *People* v. *San Nicolas* (2004) 34 al.4th 614, 667; *People* v. *Holloway* (2004) 33 Cal.4th 96, 142; People v. *Crew* (2003) 31 Cal.4th 822, 848-849; *People* v. *Yeoman* (2003) 31 Cal.4th 93, 131; *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1224; *People* v. *Crandell* (1988) 46 Cal.3rd 833, 871.) The Court of Appeal quotes this concession by appellant and asserts that "[t]he point of Lao's argument is difficult to fathom." (Slip op., p. 27.) But the point did not lie very deep, and if the Court failed to "fathom" it, it was only for lack of trying.

For if one merely read a sentence or two further in the argument, one would have come across this assertion: "Nonetheless, the argument is not barred, and is necessary at least for purposes of further review." (AOB, p. 28.) Thereupon, appellant launched into an argument that, contrary to this Court's pronouncements, the instructions were fundamentally unfair and did not in fact benefit the criminal defendant. Appellant cited in support of his claim, *State* v. *Wright* (Or.App. 1977) 572 P.2nd 667, 668, which holds that similar instructions are fundamentally unfair. Finally, appellant argued that they were prejudicial in this case where the *alleged victim* had given false statements to the police which a jury could construe as showing *his* consciousness of guilt – a question highly relevant to that of self-defense.[3]

Essentially, such instructions have the effect of throwing, or appearing to throw, the prestige and weight of the court itself behind the theory of the

---

[3] The Court of Appeal raises the principle of *stare decisis* to an epistemological level where it has no proper place. Instead of merely citing this Court's authority as *institutionally* dispositive, the Court makes this question-begging assertion: "[W]e do not perceive how the combined effect of instructions that were concededly proper and applicable to the case can be alchemized into a finding of prejudicial error." (Slip op., p. 27.) Of course, no wizardry was required. The argument is that these instructions *should not be deemed proper*. One wonders who is and is not practicing alchemy here.

prosecutor at trial. A fair and reliable determination in a criminal case requires of course a fair and impartial trier of fact. (*In re Murchison* (1955) 349 U.S. 133, 136; *Marshall* v. *Jerrico, Inc.* (1980) 446 U.S. 238, 242.) In a criminal case, where there is a Sixth Amendment guarantee of a jury consisting of impartial and indifferent jurors, capable of deciding the case based on evidence and law presented in court. (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 721-722; *Turner* v. *Louisiana* (1965) 379 U.S. 466, 471-473; *Peters* v. *Kiff* (1972) 407 U.S. 493, 501-502.) This Court should grant review in order to reassess its position on these instructions.

## CONCLUSION

For any or for all of the foregoing reasons, petition for review should be granted.

Dated: January 2, 2008

Respectfully submitted,

Mark D. Greenberg
Attorney for Appellant Lao

19

## CERTIFICATION OF WORD-COUNT

I am attorney for appellant in the above-titled action. This petition has been produced by computer, and in reliance on the word-count function of the computer program used to produce this document, I hereby certify that, exclusive of the table of contents, the attached court of appeal decisions, and this certificate, this document contains 5962 words.

Dated: January 2, 2008

Mark D. Greenberg
Attorney for Petitioner

# PROOF OF SERVICE

(C.C.P §2015.5, 28 U.S.C §1746)

I, _Houa Lao_, am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

> _Houa Lao F-08644_
> _C.S.P. – Sacramento_
> _P.O. Box 290066_
> _Represa, CA 95671_

On, _December 14, 2011_, I served the following documents:

_OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS_ _____ on the

below named individuals by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

1. _UNITED STATES DIST. COURT_          2. _____
   _EASTERN DIST. OF CALIFORNIA_           _____
   _Office of the Clerk_                   _____
   _501 I St., Suite 4-200_                _____
   _Sacramento, CA 95814_                  _____

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this _14_ day of _December_, _2011_, at California State Prison at Sacramento, Represa, California.

[Signature] _____
Declarant